[Civ. No. 2650. Fifth Dist. Feb. 27, 1976.]

In re WILLY L., a Person Coming Under the Juvenile Court Law.
DALE J. GRAVER, as Chief Probation Officer, etc.,
Plaintiff and Respondent, v.
WILLY L., Defendant and Appellant.

**COUNSEL**

John M. Hanley, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Willard F. Jones and Joel Carey, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**THOMPSON, J.**\*—At the jurisdictional hearing, appellant admitted the Vehicle Code violations and the burglary, but denied the allegations of possession of marijuana and codeine contending that the drugs had been seized by means of an illegal search and seizure. The court overruled appellant's objections to the admissibility of the drugs and found the allegations of the drug violations to be true. Appellant was found to be a person described in section 602 of the Welfare and Institutions Code.

---

\*Retired judge of the superior court stting under assignment by the Chairman of the Judicial Council.

At the dispositional hearing the court considered a social study prepared by the juvenile court probation officer wherein it was recommended that appellant be removed from the custody of his parents and committed to a forestry camp in Stanislaus County and upon successful completion of the camp program to be released to the custody of his parents under specified terms of probation. Appellant's counsel recommended a local jail sentence. The juvenile court declined to follow either recommendation and ordered appellant committed to the Youth Authority.

## FACTS

At about 1:40 p.m. on November 25, 1974, Jack Smith, a Modesto police officer on duty in his patrol car in Modesto, noticed a 1967 black Cadillac convertible proceeding at a speed which appeared to be 5 or 10 miles over the 25-mile-per-hour speed limit. While following the Cadillac, Officer Smith noticed that neither the brake lights nor the turn signal of the Cadillac appeared to be working and he stopped the vehicle for that reason. Officer Smith asked the driver of the vehicle, appellant, for identification, but appellant was unable to produce either a driver's license or any other type of written identification. Therefore, Officer Smith placed appellant, whom he had discovered to be only 17 years old, under arrest for failure to have a driver's license in his possession and for being unable to identify himself with proper identification.

Officer Smith, who had noticed a "light odor of marijuana" emanating from the vehicle while questioning and arresting appellant, patted appellant down for weapons or contraband before placing him in the patrol car. During this patdown, he felt "two bulky objects" in the front portion of each of the boots which appellant was wearing. Thinking these could be some sort of weapon, the officer reached into the boots and removed two plastic baggies of what appeared to be marijuana from each boot. He then re-arrested appellant and made a further search of appellant's person for weapons or further contraband. He discovered a fifth plastic baggie, which also appeared to contain marijuana, in appellant's front pants pocket.

Appellant was handcuffed and placed in the rear seat of the patrol car. Officer Smith opened the front door of appellant's Cadillac, whereupon he noticed an "extremely strong" odor of fresh marijuana. He also saw what appeared to be burnt and unburnt marijuana seeds on the front seat, floorboard, and back seat of the vehicle.

Because of the manner in which the convertible was constructed, Officer Smith could tell that the odor was emanating from the trunk of the Cadillac. He was able to partially view the trunk compartment through the "well" into which the convertible top retracted from the back seat of the vehicle; however he could not observe any of the contents in the trunk because he did not have his flashlight with him. Officer Smith opened the trunk with the key from the ignition; he found a set of scales, and a bag containing a "brick" of what appeared to be marijuana, packaged in a form for sale. Also, pushed down in the crack of the rear seat, the police discovered some wrapped tablets and white powder subsequently identified as codeine.

The "brick" and the contents of the five baggies found on appellant's person, were determined to be marijuana.

### Legality of the Search

Appellant contends that the patdown search of his person and the subsequent search of his vehicle were illegal and that the contraband seized as a result of the search should have been suppressed.

When the driver of an automobile fails to present his driver's license or other satisfactory evidence of his identity for examination by an officer, the law requires that he be arrested and taken without unnecessary delay before a magistrate. (Veh. Code, § 40302, subd. (a).) ■ When it becomes necessary for an officer to confine a traffic law violator within his police vehicle the officer is entitled to conduct a patdown search for weapons. (*People v. Brisendine* (1975) 13 Cal.3d 528, 537-538 [119 Cal.Rptr. 315, 531 P.2d 1099]; see also *People v. Superior Court (Simon)* (1972) 7 Cal.3d 186, 214 [101 Cal.Rptr. 837, 496 P.2d 1205].) In such a situation the increased danger to the officer warrants the patdown, and there is no need to independently establish a factual basis that the arrestee is armed prior to the patdown.

■ The sole justification for such a search, however, is "the protection of the police officer . . . , and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs or other hidden instruments for the assault of the police officer." (*Terry v. Ohio* (1968) 392 U.S. 1, 29-30 [20 L.Ed.2d 889, 910-911, 88 S.Ct. 1868, 1883-1885]; *People v. Brisendine, supra,* 13 Cal.3d at p. 542.) ■ To lawfully exceed the scope of a patdown the officer must be able to point to specific and articulable facts reasonably supporting his suspicion that

the suspect is armed. (*People* v. *Collins* (1970) 1 Cal.3d 658, 662 [83 Cal.Rptr. 179, 463 P.2d 403]; *People* v. *Brisendine, supra,* 13 Cal.3d at p. 542.) For example, in *People* v. *Mosher* (1969) 1 Cal.3d 379 [82 Cal.Rptr. 379, 461 P.2d 659], the patdown of a burglary suspect revealed a "sharp object like a knife blade." On further investigation the object was found to be a watch band belonging to a murder victim. In upholding the search, the Supreme Court carefully distinguished the feel of a "knife blade" from a "box of matches, a plastic pouch, a pack of cigarettes, a wrapped sandwich, a container of pills, a wallet, coins, folded papers, and many other small items . . . [which] do not ordinarily feel like weapons." (1 Cal.3d at p. 394.)

*Brisendine, supra,* however, makes the following observation: "In the ordinary pat-down circumstances the clothing of the person is seldom, if ever, so resistant or resilient as to prevent the police from determining whether there are weapons present. But if in some unique fact pattern such were the case, we would likely be persuaded that a limited further intrusion was necessary. To do otherwise would be to make the unreasonable demand that an officer allow a potentially armed suspect to enter his patrol car. We noted above that even in the ordinarily innocuous confrontation between an officer and a traffic arrestee who is to be transported before a magistrate, there is the possibility of violence." (13 Cal.3d at pp. 542-543.)

■ The record shows that when conducting the patdown Officer Smith felt two "bulky" objects near the ankle area in each of appellant's zip-up boots. No testimony was given as to the weight or consistency of the objects while they were in appellant's boots. Although the individual baggies are not heavy or hard, the inference from the testimony is that they were placed one on top of the other inside the boot thereby giving the impression of a larger object. We judicially note that boots are less resilient than other items of clothing. The only logical reason a person would place items in boots is for concealment; it is not unusual for weapons to be concealed there. Considering all of these circumstances, we conclude that Officer Smith showed specific and articulable facts reasonably supporting his suspicion that appellant might be armed. The seizure of the marijuana in appellant's boots was lawful.

■ After finding the marijuana in appellant's boots, Officer Smith testified that when he opened the door of appellant's car he noticed an "extremely strong" odor of fresh marijuana in the vehicle which he could tell was emanating from the trunk because of the opening in the well

between the trunk and passenger section of the car. ■ The odor of marijuana in a vehicle is sufficient to give probable cause to search the vehicle for contraband. (*People* v. *Cook* (1975) 13 Cal.3d 663, 668-669 [119 Cal.Rptr. 500, 532 P.2d 148]; *People* v. *Gale* (1973) 9 Cal.3d 788, 794 [108 Cal.Rptr. 852, 511 P.2d 1204]; *People* v. *Fitzpatrick* (1970) 3 Cal.App.3d 824, 825-826 [84 Cal.Rptr. 78].)

■ *People* v. *Gregg* (1974) 43 Cal.App.3d 137 [117 Cal.Rptr. 496], relied on by appellant, is distinguishable. In *Gregg,* the arresting officer had no reason to suspect the contraband was located in the trunk compartment other than the discovery of a few marijuana seeds in the interior of the car and the odor inside the car of recently burned marijuana. Here, because of the strong odor of fresh marijuana coming from the trunk Officer Smith had probable cause to believe that fresh marijuana was in the trunk. The search of appellant's car and its trunk was lawful, and the contraband discovered pursuant to that search was properly admitted into evidence.

### VALIDITY OF COMMITMENT TO YOUTH AUTHORITY

■ Willy L. contends that the juvenile court abused its discretion in committing him to the California Youth Authority. We do not agree.

As the probation officer observed, "the Juvenile Court must take strong action" because Willy L., although a "mentally bright, sophisticated youth," was involved in a "serious pattern of delinquent behavior." It affirmatively appears that the juvenile judge entered his order only after much deliberation and deep concern. The pattern of criminality exhibited by appellant was not trivial. The burglary at issue involved the theft from a private home of liquor worth approximately $1,265. Similarly, the possession for sale, at age 17 years, of a "brick" of marijuana, along with scales necessary for weighing and measuring it, was also a most serious offense, not to mention the minor's possession of codeine. We believe that a minor who participates in a large scale burglary and uses the proceeds from such a burglary to set himself up in drug dealing is so criminally oriented as to make it highly unlikely that he will be further corrupted by incarceration in the California Youth Authority.

■ As we interpret *In re Aline D.* (1975) 14 Cal.3d 557 [121 Cal.Rptr. 816, 536 P.2d 65], it stands only for the proposition that before a California Youth Authority commitment will be upheld upon review, it must appear from the record that the committing court was fully satisfied as to the probability that the ward would benefit from such a commitment. And though in *In re Aline D., supra,* the referee made a

finding that the ward would probably benefit from a commitment to California Youth Authority the entire record is replete with expressed doubts as to the suitability of such a commitment. In the instant case the record contains no such expressions of doubt and ample evidence to support a commitment to California Youth Authority as a proper exercise of the court's discretion.

We find these notable distinctions between the present case and *In re Aline D., supra.* In *Aline D.* the sole thrust of all of the evidence both from court personnel and court-appointed psychiatrists and a psychologist was that a California Youth Authority commitment for Aline D. would be contraindicated and the referee in his ultimate decision to send Aline D. to California Youth Authority was based not upon the suitability of such an order but upon the unavailability of any other resource.

In *Aline D.* we have a minor who is possibly a borderline mentally retarded child. The court in *Aline D.* in fact suggests that if all resources for handling juvenile offenders are unsuitable the juvenile court proceedings should be dismissed (p. 566). We infer that the court intended to indicate that Aline D. should then be processed under proceedings for the mentally disordered.

■ Aline D.'s anti-social conduct appears to be impulsive and the product of poor peer associations.

Willy L. on the other hand is a calculating sophisticated youth who is described in the probation report as a leader of a delinquent peer group with a reputation as a "big drug dealer". (Ironically, appellant's counsel argued on his motion to suppress that the police made their initial stop of appellant's vehicle because they knew him to be a drug dealer.)

And while it is true that Willy L. although no stranger to the juvenile delinquency proceedings prior to the present offenses, i.e., two petty thefts and possession of marijuana, which charges were informally processed without the filing of a petition, the fact that Willy L. was first brought to a dispositional hearing on the present offenses is not determinative. These offenses were all the more serious because each element was carefully planned. The large theft of liquor, $1,265 worth, provided the funds to secure a substantial supply of marijuana. The scales were strong proof of an intent to deal on a large scale.

The parents of Willy L. recognized that he was beyond their control.

We find nothing in *Aline D.* which emasculates the juvenile court's discretion to send a severely delinquent youth to California Youth Authority if it appears to the court that such disposition is most likely to effect the rehabilitation of the juvenile. As we have noted Willy L.'s own counsel recognized that his client should be placed in a custodial situation, in his opinion the juvenile section of the county jail.

Nor can we find any legal, let alone rational, basis for lending significant weight to the recommendation of the probation officer's recommendation that Willy L. be sent to a forestry camp. Given Willy L.'s determination to corrupt other youths by peddling marijuana on a large scale the inevitably difficult problems of supervision in such a facility as a forestry camp would tend to offer Willy L. opportunities to continue his "salesmanship" of controlled substances in relative security.

██ The proper rule for application here is stated in *In re Clarence B.* (1974) 37 Cal.App.3d 676, 682 [112 Cal.Rptr. 474]: "It is well settled in California that when a public offense has been committed by a juvenile, certification of the juvenile to the CYA is within the sound discretion of the committing court, be it the juvenile court (Welf. & Inst. Code, §§ 731, 1736) or the superior court (Welf. & Inst. Code, § 1731.5.) [Citations.] The decision of the juvenile or superior court may be reversed on appeal only upon a showing that the court abused its discretion in committing the minor to the CYA. [Citations.] A reviewing court must indulge in all reasonable inferences to support the findings of the juvenile court, and such findings will not be disturbed on appeal when there is substantial evidence to support them. [Citation.]"

The dissenting opinion raises an issue not raised or argued by either party relating to the requirements of Welfare and Institutions Code section 726. ██ Contrary to our colleague's contention the record herein demonstrates compliance with that section. The section requires one of three alternative findings before a ward may be taken from the physical custody of a parent—an issue not raised or argued by either party.

One of the requisite findings required under said section 726, subdivision (c), is that the welfare of the minor requires that his custody be taken from his parent or guardian. We note also that section 502 of the Welfare and Institutions Code provides further in part that such

removal can be made ". . . when his [the minor's] welfare or safety and *protection of the public* cannot be adequately safeguarded without removal."

Such requisite finding may be inferred from the transcript in lieu of entry in the minute order. (*In re Hartman* (1949) 93 Cal.App.2d 801, 807 [210 P.2d 53].) However, reliance need not be placed upon that rule as the court made the necessary finding in the written order itself.

After a lengthy dispositional hearing and consideration of the "dispositional social study," the court's minute order stated: "The Court makes its findings pursuant to the provisions of Section 727c [*sic*] Juvenile Court Law." Further, as stated in our colleague's dissent, the juvenile judge verbally stated: "Pursuant to Section 726 of the Welfare and Institution[s] Code the minor is ordered—is removed from the custody of his parents." The dispositional social study, which is part of the record relied upon by the court, stated: "It is further recommended pursuant to Section 726c of the Welfare and Institutions Code that it be found to be in the best interest, welfare, and protection of WILLY [L.] that he be removed from the custody of his parents. . . ."

Thus the necessary finding is clearly present.

We hold that the court did not abuse its discretion in committing Willy L. to the California Youth Authority.

The judgment is affirmed.

Brown (G. A.), P. J., concurred.

**FRANSON, J.,** Concurring and Dissenting.—I concur in the holding that appellant's arrest and search was lawful. I dissent, however, from the holding that appellant was properly committed to the Youth Authority.

Section 502 of the Welfare and Institutions Code provides: "The purpose of this chapter is to secure for each minor under the jurisdiction of the juvenile court such care and guidance, preferably in his own home, as will serve the spiritual, emotional, mental, and physical welfare of the minor, and the best interests of the state; to preserve and strengthen the minor's family ties whenever possible, removing him from the custody of his parents only when his welfare or safety and protection of the public cannot be adequately safeguarded without removal; *and*

*when the minor is removed from his own family, to secure for him custody, care, and discipline as nearly as possible equivalent to that which should have been given by his parents. This chapter shall be liberally construed to carry out these purposes.*" (Italics added.)

Juvenile commitment proceedings are designed for the purposes of rehabilitation and treatment of the minor, and not for punishment. (*In re Aline D.* (1975) 14 Cal.3d 557, 567 [121 Cal.Rptr. 816, 536 P.2d 65]; *In re J. L. P.* (1972) 25 Cal.App.3d 86, 89 [100 Cal.Rptr. 601].)

Section 731 of the Welfare and Institutions Code provides that, "When a minor is adjudged a ward of the court on the ground that he is a person described by Section 602, the court may order any of the types of treatment referred to in Sections 727 and 730, [1] and as an additional alternative may commit the minor to the Youth Authority."

In *In re Aline D., supra,* 14 Cal.3d 557, our Supreme Court, by strong and persuasive dicta, noted that sections 727, 730 and 731 establish a progressive commitment procedure. The court stated:

". . . 'The statutory scheme . . . as now embodied in sections 730 et seq. of the Welfare and Institutions Code, contemplates a progressively restrictive and punitive series of disposition orders in cases such as that now before us—namely, home placement under supervision, foster home placement, placement in a local treatment facility and, as a last resort, Youth Authority placement.'

"As is evident from the applicable statutes, 'Commitments to the California Youth Authority are made only in the most serious cases and only after all else has failed.' (Thompson, Cal. Juvenile Court Deskbook, § 9.15, p. 123.) This concept is well established and has been expressed by the CYA itself. In light of the general purposes of juvenile commitments expressed in Welfare and Institutions Code section 502, . . . , '. . . commitment to the Youth Authority is generally viewed as *the final treatment resource* available to the juvenile court and which least meets the description in the above provision [§ 502]. Within the Youth Authority system, there is gathered from throughout the State the most severely delinquent youths which have exhausted local programs.'

---

[1]Sections 727 and 730 provide for alternate dispositions less severe than the Youth Authority including a juvenile home, ranch, forestry camp, or the custody of some reputable person of good moral character, or some appropriate association, society, corporation or agency.

(Italics added; California Youth Authority, Criteria and Procedure for Referral of Juvenile Court Cases to the Youth Authority (1971) p. 1.) . . . .

". . . The 'criteria' lists . . . several 'inappropriate cases' for commitment, including . . . (2) unsophisticated, mildly delinquent youths, 'for whom commingling with serious delinquents who make up the bulk of the Youth Authority population might result in a negative learning experience and serious loss of self-esteem'; . . ." (14 Cal.3d at pp. 564-565.)

*In re Aline D., supra,* clearly suggests that less severe treatment alternatives should be attempted by the juvenile court before committing a minor to the Youth Authority, particularly in a case where the minor has not exhibited serious aggressive or assaultive tendencies and has not appeared before in the juvenile court. In keeping with the spirit of the law, if the juvenile court does not deem it appropriate to utilize the progressive treatment approach suggested in *Aline D.,* I believe that the record at the very least should contain some evidence to support an implied finding that the minor would not successfully benefit from placement in a local facility.

The majority's description of appellant as a "calculating sophisticated youth" and a "big drug dealer" does not aid in resolving the legal issue before us. Such rhetoric merely reflects the majority's prejudice against the clear mandate of the juvenile court law that a young person should be committed to the Youth Authority *only as a last resort.* (Welf. & Inst. Code, § 502; *In re Aline D., supra,* 14 Cal.3d 557; see also *In re Maria A.* (1975) 52 Cal.App.3d 901, 903 [125 Cal.Rptr. 382].)

In the present case appellant had a minimal history of criminal offenses (petty theft and possession and use of marijuana), none of which had been deemed serious enough to bring him before the juvenile court. He twice had been placed on informal probation "at the house level" and had completed the probation periods without violation. The vehicle violations, marijuana possession and burglary did not involve violence or assaultive conduct on his part. Appellant appeared cooperative at both the jurisdictional and dispositional hearings; he admitted the burglary and the vehicle violations, and he readily admitted that the marijuana found on his person and in the trunk of his car belonged to him. He denied, however, any knowledge of the codeine, explaining that he had just regained possession of his car two days before and did not know the

codeine was in the car. He said the scales found in the trunk belonged to a friend.

The probation officer had conducted a thorough investigation and had recommended that appellant be placed in a local forestry camp (with 24-hour supervision) and upon successful completion of the camp program that he be released to the custody of his parents upon specified terms of probation. I find nothing in the record to suggest that appellant would not have benefited by placement in the camp to the same extent as he would have benefited by placement at the Youth Authority. Moreover, the record does not disclose any reason or finding of the court as to why it believed that appellant would not have been successfully rehabilitated by placement in the forestry camp or some other local facility.

The record shows that the judge was concerned about the fact that the burglary reportedly involved the theft of some $1,200 worth of liquor from a private residence, that appellant probably had been dealing in marijuana at his high school, and that he was driving a Cadillac when his father was unemployed. All of these are matters of concern, yet standing alone they do not justify a Youth Authority commitment. (*In re William M.* (1970) 3 Cal.3d 16, 30 [89 Cal.Rptr. 33, 473 P.2d 737]; *In re J. L. P. supra,* 25 Cal.App.3d 86, 89.) Having in mind that juvenile commitment proceedings are not to punish but to rehabilitate, there must be some showing apart from the seriousness of the crimes of which the defendant is convicted that the Youth Authority rather than a local facility would better serve the rehabilitative needs of the minor. For example, in the present case, if the judge had believed that appellant would benefit from certain vocational training or academic programs available at the Youth Authority which were not available locally, he should have judicially noted this fact for the record. Absent such evidence, no meaningful appellate review can be made of the judge's exercise of discretion.

I recognize that historically a Youth Authority commitment has been a matter for the sound discretion of the juvenile court. For example, in *In re Dale S.* (1970) 10 Cal.App.3d 952, 957 [89 Cal.Rptr. 499], in upholding a Youth Authority commitment, the court noted that the minor had been adjudged by the juvenile court to have come under the provisions of sections 601 or 602 on three occasions; he had run away from home, possessed and sold marijuana; stolen a motorcycle, used LSD, and constantly violated the terms of his probation, and habitually refused to obey all authority. Similarly, in *In re Clarence B.* (1974) 37 Cal.App.3d

676, 683 [112 Cal.Rptr. 474], it was held not to be an abuse of discretion for a minor to be committed to the Youth Authority when he was found to have committed rape and oral copulation; had a history of shoplifting, possession of marijuana and other offenses; had been before the juvenile court several times and could not adjust to community or home placements, and had not been able to make a minimal adjustment in a forestry camp and other local placement programs.

The traditional standard for the exercise of judicial discretion in committing a minor to the Youth Authority has been the minor's "suitability" for treatment in the Youth Authority. (*People* v. *Hutson* (1963) 221 Cal.App.2d 751, 754-755 [34 Cal.Rptr. 790].) However, Welfare and Institutions Code section 734 provides: "No ward of the juvenile court shall be committed to the Youth Authority unless the judge of the court is *fully satisfied* that the mental and physical condition and qualifications of the ward are such as to render it *probable* that he will be benefited by the reformatory educational discipline or other treatment provided by the Youth Authority." (Italics added.)

I infer from the emphasized language a legislative intent that before a minor is committed to the Youth Authority the juvenile court must consider and reject a local placement and that its decision must be supported by substantial evidence from which it may be inferred that the minor could better be treated at the Youth Authority. To hold otherwise is to vest an unlimited discretion in the juvenile court to send a minor to the Youth Authority.

Moreover, the test for determining an abuse of discretion in adult sentencing and probation proceedings is not applicable to proceedings under the Juvenile Court Law. "[The Juvenile Court Law] 'contemplates a progressively restrictive and punitive series of disposition orders . . . namely, home placement under supervision, foster home placement, placement in a local treatment facility and, as a last resort, Youth Authority placement." (*In re Aline D., supra,* 14 Cal.3d at p. 564; *In re Arthur N.* (1976) 16 Cal.3d 226 [127 Cal.Rptr. 641, 545 P.2d 1345].) I find it ironic that my colleagues in the majority have recently expressed their approval of the progressive punishment concept of *In re Aline D., supra.* In *In re Maria A.* (1975) 52 Cal.App.3d 901 at page 903 [125 Cal.Rptr. 382] it is stated, "If Maria A. had been under the age of 18 years she could not have been sent to the Youth Authority without a *specific finding* under the provisions of section 734 . . . that no suitable alternative exists. The case of *In re Aline D.* . . . contains a full exposition as to the

wisdom of using the Youth Authority *only as a last resort."* (Italics added; 52 Cal.App.3d 901—opinion by Thompson, J., concurred in by Brown, P. J.)

I would not require the juvenile court to choose a dispositional alternative other than Youth Authority for an offender simply because he is appearing before the juvenile court for the first time, nor would I hold that the juvenile court is bound by the probation officer's recommendation as to placement. What I say is simply that before the court can commit a minor to the Youth Authority there must be some evidence in the record to support a finding that he cannot be rehabilitated at a local facility. Such a rule is in keeping with the spirit and intent of the Juvenile Court Law. (Welf. & Inst. Code, §502; *In re Aline D., supra,* 14 Cal.3d at pp. 564-565.)

There is another reason why the case must be reversed and remanded for reconsideration. Welfare and Institutions Code section 726 provides that no ward shall be taken from the physical custody of a parent unless upon the hearing the court finds one of the following facts: (a) that the parent is incapable of providing or has failed or neglected to provide proper maintenance, training and education for the minor; (b) that the minor has been tried on probation and such custody and has failed to reform; or (c) that the welfare of the minor requires that his custody be taken from his parent. Such a finding under section 726 is a jurisdictional prerequisite to the removal of a minor from the custody of his parent or guardian. (*In re Edwards* (1930) 208 Cal. 725, 731 [284 P. 916]; *In re Batey* (1960) 183 Cal.App.2d 78, 80 [6 Cal.Rptr. 655]; *In re Syson* (1960) 184 Cal.App.2d 111, 113-114 [7 Cal.Rptr. 298]; *In re Bacon* (1966) 240 Cal.App.2d 34, 59 [49 Cal.Rptr. 322]; *In re Macidon* (1966) 240 Cal.App.2d 600, 607 [49 Cal.Rptr. 861]; *In re Adele L.* (1968) 267 Cal.App.2d 397, 405-406 [73 Cal.Rptr. 76].)

In the instant case the requisite finding is not entered in the minutes, nor does the court make the finding orally. The court merely stated: "Pursuant to section 726 of the Welfare and Institutions Code, the minor is ordered . . . is removed from the custody of his parents." The absence of a specific finding under section 726 is particularly significant. The probation officer's report stated that while the minor's parents realized that their son was beyond their control and that an out-of-home placement could be of benefit to him they also said that they were willing to work with the probation department in order to bring about an acceptable behavioral change. This statement could be interpreted as

meaning that the parents believed that their son could be straightened out by means of strict juvenile court probationary procedures while he remained in their home.

I would reverse the judgment.

Appellant's petition for a hearing by the Supreme Court was denied April 28, 1976.