[Civ. No. 17466. Third Dist. Sept. 28, 1978.]

In re GREGORY S., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
GREGORY S., Defendant and Appellant.

■■■■■■■

■■■■■■■

**COUNSEL**

Robert N. Chargin, Public Defender, and Randy Sue Pollock, Deputy Public Defender, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Charles P. Just, Richard L. Adams, James T. McNally and Paul H. Dobson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**PARAS, J.**—The minor, Gregory S., appeals from orders adjudicating him a ward of the court under Welfare and Institutions Code section 602, and committing him to the Youth Authority.

Pending disposition of earlier adjudications in which Gregory was found to have violated Penal Code sections 242 (battery) and 148 (resisting arrest), both misdemeanors, a petition was filed on October 18, 1977, charging him with kidnaping for the purpose of robbery (Pen. Code, § 209), assault with a deadly weapon (Pen. Code, § 245, subd. (a)), robbery (Pen. Code, § 211), and auto theft (Veh. Code, § 10851). On October 21st another petition was filed charging him with robbery (Pen. Code, § 211), burglary of a residence (Pen. Code, § 459), and burglary of a motor vehicle (Pen. Code, § 459). On October 24th and on November 4th, two more petitions were filed charging him with seven more burglaries (Pen. Code, § 459).

Following the jurisdictional hearing on the offenses charged in the October 18th petition, the court found the first three charges of the petition, kidnaping for the purpose of robbery, assault with a deadly

weapon, and robbery to be true[1] and that the latter two offenses merged with the kidnaping offense. Thereafter, having properly been advised of his *Boykin-Tahl* rights with the understanding that all remaining charges and petitions would be dismissed, Gregory admitted two of the three offenses charged in the petition of October 21st (robbery and burglary). The dispositional hearing was held on January 9, 1978.

I

Contrary to Gregory's contention, there is sufficient evidence to support the conviction of kidnaping for the purpose of robbery. We disagree with his argument that the asportation of the victim was merely for the purpose of committing an assault. ■ The standard of review in criminal cases applies to juvenile proceedings. (*In re Roderick P.* (1972) 7 Cal.3d 801, 808-809 [103 Cal.Rptr. 425, 500 P.2d 1].) ■ The appellate court must view the evidence in the light most favorable to the respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*People* v. *Vann* (1974) 12 Cal.3d 220, 225 [115 Cal.Rptr. 352, 524 P.2d 824].) The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact, not whether guilt is established beyond a reasonable doubt to the appellate court's satisfaction. (*People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].) The evidence, and all reasonable inferences therefrom, must be viewed in the light most favorable to the respondent; and all conflicts in the evidence must be resolved in favor of respondent. (*People* v. *Camden* (1976) 16 Cal.3d 808, 812 [129 Cal.Rptr. 438, 548 P.2d 1110].)

■ A violation of Penal Code section 209 occurs where the kidnaping is in furtherance of a robbery. The specific intent to commit robbery must be formed before the asportation is undertaken. (*People* v. *Thornton* (1974) 11 Cal.3d 738, 769-770 [114 Cal.Rptr. 467, 523 P.2d 267]; *People* v. *Tribble* (1971) 4 Cal.3d 826, 831-832 [94 Cal.Rptr. 613, 484 P.2d 589]; *People* v. *Isitt* (1976) 55 Cal.App.3d 23, 28 [127 Cal.Rptr. 279].)

Robert Huiras testified that on October 18, 1977, at approximately 10:50 p.m., while walking down Bianchi Street, three males approached him. One of them, armed with a .38 caliber revolver, ordered Huiras to walk to and enter a white 1962 or 1963 Chevrolet. The larger of the three then put a headlock on him and forced him into the vehicle. He was there

---

[1]The court found that the evidence did not sustain the auto theft charge.

asked if he had money and responded that all he had was 50 cents but could get more. They drove around for approximately 15 to 20 minutes, then Huiras was ordered out of the car and told to take off his clothes; after the three took his clothes, his wallet, and the 50 cents, they struck him with the gun on the head, rendering him unconscious and causing him to fall; they then started kicking him. When Huiras regained consciousness, the three were gone. Huiras identified Gregory as one of the three participants.

Later that night Officer William Thompson clocked a vehicle, a 1964 Chevrolet, at 70 miles per hour. He turned on his red light and followed it off the freeway; it came to a stop, and as Thompson got out of his patrol car, it sped off. Thompson pursued again with red light and siren activated; the Chevrolet slowed to about five miles an hour, and at that speed its three occupants, including Gregory, exited and ran. The area was surrounded, and in due course Gregory was apprehended. Huiras' wallet and a loaded revolver were found on the front seat of the Chevrolet.

After indicating that he understood and waived his *Miranda* rights, Gregory told Thompson that Michael McCormick and Derick Hill had been driving around and picked him up; they drove on until they saw Huiras; they made a "U" turn, stopped, and McCormick and Hill forced Huiras into the car. After driving around North Stockton, they stopped and McCormick and Hill forced Huiras out of the car, and beat him. Although Gregory denied to Thompson any participation in the kidnaping, robbery, and beating, when later questioned by police officer, David Duly, he admitted his active involvement.

From the above evidence, it can reasonably be inferred that the intent to commit robbery was formed before the kidnaping.

## II

█ Gregory contends that there is an insufficient showing that at age 13 he appreciated the wrongfulness of his act as required by Penal Code section 26. Section 26 provides in pertinent part that "[a]ll persons are capable of committing crimes except . . . [c]hildren under the age of 14 in the absence of clear proof that at the time of committing the act charged against them, they knew its wrongfulness." In *In re Gladys R.* (1970) 1 Cal.3d 855, 862-867 [83 Cal.Rptr. 671, 464 P.2d 127], the Supreme Court considered section 26 in relation to Welfare and

Institutions Code section 602.[2] It declared, consistently with the statute, that because of the criminal connotations of a section 602 adjudication, unless the age, experience, knowledge, and conduct of a minor under 14 demonstrate by clear proof that he understands the wrongfulness of his act, he should not be declared a ward. (See *In re Michael B.* (1975) 44 Cal.App.3d 443, 445-446 [118 Cal.Rptr. 685].)

There is ample evidence here from which it can be concluded that Gregory was fully aware of the wrongfulness of the act. His understanding of the situation is manifested inter alia by his flight from the vehicle following pursuit and by the two different stories he gave to the officers.

### III

■ Gregory also contends that the juvenile court abused its discretion in committing him to the Youth Authority. He relies on the principle enunciated in *In re Aline D.* (1975) 14 Cal.3d 557, 564 [121 Cal.Rptr. 816, 536 P.2d 65], that the Juvenile Court Law contemplates a progressively restrictive and punitive series of disposition orders with Youth Authority placement as a last resort. (See also *In re Arthur N.* (1976) 16 Cal.3d 226, 237 [127 Cal.Rptr. 641, 545 P.2d 1345]; *In re Michael R.* (1977) 73 Cal.App.3d 327, 334-335 [140 Cal.Rptr. 716].) He points out that at the time of the offense he was but 13 years old, had never been adjudged a ward of the court under section 602, and this was his first serious offense.

A commitment to the Youth Authority is within the sound discretion of the juvenile court and its decision will not be reversed unless there is a showing that the court abused its discretion. (*In re Michael R., supra,* 73 Cal.App.3d at pp. 332-333; *In re Clarence B.* (1974) 37 Cal.App.3d 676, 682 [112 Cal.Rptr. 474].) The reviewing court must indulge in all reasonable inferences to support the findings of the juvenile court and such findings will not be disturbed on appeal when there is substantial evidence to support them. (*Ibid.*)

■ In most instances commitments to the Youth Authority are to be made only in the most serious cases and only after all else has failed. (*In re Aline D., supra,* 14 Cal.3d at p. 564; *In re Michael R., supra,* 73 Cal.App.3d at p. 334.) However, the circumstances in a particular case may well suggest the desirability of a Youth Authority commitment

[2]Section 602 provides in part that "Any person under the age of 18 years who violates any law of this state . . . defining crime . . . is within the jurisdiction of the juvenile court, which may adjudge such person to be a ward of the court."

despite the availability of alternative dispositions such as placement in a county camp or ranch. (See *In re John H.* (1978) 21 Cal.3d 18, 27 [145 Cal.Rptr. 357, 577 P.2d 177].) We find this to be such a case.

Both the psychiatrist, Thomas English, and the clinical psychologist, John Hannon, indicated that in light of Gregory's aggressive behavior, which was becoming progressively more antisocial and dangerous, he needed a structured placement, preferably a locked facility, since he had threatened to run away from any placement he did not like or at which he was retained too long. The observation of Dr. English was that the majority of out-of-home placements did not deal well with the aggressive and antisocial child. Hannon observed that Gregory was "street-wise" and opined that if he did not like his placement, he was very likely to run away and probably commit additional crimes.

The court summarized the facts and considerations upon which it based its order. Although only 13 years old, Gregory was very aggressive and violent; pending disposition regarding two violent acts, battery and resisting arrest, he committed other more serious and more violent acts, armed robbery, burglary, and kidnaping for the purpose of robbery with physical assault upon a 15-year-old victim. Even though intelligent, Gregory seldom attended school and made no effort to assist himself. His threats to run away from any type of long-term placement required consideration of the need for a locked facility for his own good. The public was entitled to protection from further criminal acts of Gregory, further necessitating use of a locked facility. Gregory would benefit from the Youth Authority's educational facilities and a commitment to the Youth Authority was in his own best interests.

It is readily apparent from these comments that the court did not act arbitrarily. The facts and circumstances indicate the propriety of the Youth Authority commitment. (See *In re John H., supra*; *In re Willy L.* (1976) 56 Cal.App.3d 256, 265 [128 Cal.Rptr. 592].) This case is readily distinguishable from such cases as *In re Aline D., supra,* and *In re Michael R., supra.* Moreover the Legislature in 1977 (effective Jan. 1, 1978) amended Welfare and Institutions Code section 202 to provide that one of the purposes of the Juvenile Court Law is "to protect the public from criminal conduct by minors." This long overdue objective of juvenile justice was correctly taken into account in deciding upon the commitment.

The orders appealed from are affirmed.

Puglia, P. J., concurred.

**REYNOSO, J.**—I concur in the result only. Our Supreme Court has declined to provide effective guidance to the juvenile court as to when to commit a youth who has engaged in acts of violence to the Youth Authority. (See *In re John H.* (1978) 21 Cal.3d 18 [145 Cal.Rptr. 357, 577 P.2d 177].)[1] In the absence of such guidance, I cannot say that discretion has been abused. The legislative scheme, together with the lack of judicial guidance, has placed on the juvenile court a task impossible of performance.

We deal with a youngster who, at the time of the hearing, was 13 years old and weighed 95 pounds.

The statute declares that such a youngster cannot be committed to the Youth Authority without a finding on the part of the juvenile court that the incarceration is in the boy's best interest. (Welf. & Inst. Code, § 734.)[2] The trial court has thus ruled that the minor will be benefited by such incarceration. The statute places the juvenile court in a position of deciding that it is in the best interest of a 13 year old to be incarcerated with older, criminally prone, juveniles in a setting where physical assaults, including sexual attacks, are all too common. How can this be?

The statutory scheme contemplates a Youth Authority very different from today's reality. The Youth Authority was initially established to benefit youngsters of tender years who would benefit from the educational, rehabilitative, and other helpful efforts. In fact, today's Youth Authority is reserved for "the most severely delinquent youths" (*In re Aline D., supra,* 14 Cal.3d at p. 564), many of whom reach the Youth Authority through the criminal courts rather than through the juvenile courts. The legislative ideal of rehabilitation has never been a reality, and it is far less so today than yesteryear.

---

[1] The guidance of *In re Aline D.* (1975) 14 Cal.3d 557 [121 Cal.Rptr. 816, 536 P.2d 65], that the Youth Authority is an institution of last resort has been considerably weakened.

[2] Welfare and Institutions Code section 734 reads as follows: "No ward of the juvenile court shall be committed to the Youth Authority unless the judge of the court is fully satisfied that the mental and physical condition and qualifications of the ward are such as to render it probable that he will be benefited by the reformatory educational discipline or other treatment provided by the Youth Authority."

The officials who enforce the law against juveniles have always been far more realistic than the statutes contemplate. Thus, juvenile court judges have traditionally viewed their priorities in dealing with youths as follows: first, rehabilitation; second, deterrence; third, protection of society; and fourth, punishment. When dealing with a crime of violence, even with a boy as young as Gregory, the probation department official tried to balance the interest of the child with the interest of protecting society. That is reality.

Let us examine the sad facts of this case. We deal with a black youngster who had gotten into the company of some older boys. With them he committed a series of crimes, some of violence. The youngster, according to the probation officer, was used as a mascot by the older boys.

At the dispositional hearing, the juvenile court considered only those matters which were the subject of findings or admissions. The judge had before him for disposition the following:

(1) Petition dated April 18:

   *Count I*—Battery (Pen. Code, § 242).

(2) Petition dated July 14:

   *Count III*—Resisting arrest (Pen. Code, § 148).

(3) Petition dated October 18:

   *Count I*—Kidnaping for purpose of robbery
   (Pen. Code, § 209).

(4) Petition dated October 21:

   *Count I*—Robbery (Pen. Code, § 211).

   *Count II*—Burglary (Pen. Code, § 459).

Three witnesses testified at the dispositional hearing: (1) the probation officer, (2) a psychiatrist, and (3) a psychologist. The judge explained to the youth that, for practical purposes, three placement options were open to the court: sending him to (1) the Youth Authority, (2) a boys ranch, or (3) a foster home. While the youth had a propensity for assaultive

behavior the probation department rejected the notion of committing him to the Youth Authority for three related reasons. No reason appears to explain why boys' ranch option was not considered.

The first reason for rejection of Youth Authority by the probation department deals with rehabilitation. Gregory, the probation officer reported, would have a far better opportunity if placed with the Ezell James Group Home in Riverside, California. The probation officer had confidence that the home could control Gregory, that a male role model would be afforded, and that he would learn to deal with community standards. This ties to the testimony of the psychologist who found nothing emotionally wrong with Gregory but found that he was conforming to his concepts (rather than community norms) of what a young man growing into adulthood should do. Gregory had been living with his grandmother. What happened to his mother and father does not appear in the record. It does appear that Gregory appears to have had a mother who gave him a good, solid emotional foundation in the first few years of his life.

The second reason deals with the Youth Authority. Because of Gregory's age and small stature, the probation department felt that he would be subject to assault, including sexual assault, in the Youth Authority facilities. Were he to avoid that result, he would do so only by aligning himself with some bigger, tougher youngsters with even greater criminal dispositions. That is, Gregory would learn to be a "better" criminal.

Third, the interest of society would be protected without resort to the Youth Authority. Gregory needed the close supervision at the group home. Perhaps society would be saved the further trauma of another life dedicated to crime. One of the problems with Gregory, all witnesses agreed, was that he lived in an unstructured environment where involvement in violent criminal behavior seemed to have its own rewards.

The probation office tried to balance the interest of helping the minor and that of protecting society. According to the probation officer, "unless there is such a threat to society that society's welfare takes precedence over the potential treatment versus punishment of the individual," the youngster should not be placed in a "purely punitive setting."

Despite the problems of the "unsocialized aggressive behavior" on Gregory's part, both the psychiatrist and the psychologist who testified

recommended that Gregory be placed in the group home, rather than in a Youth Authority facility. They were not very well informed about the group home nor about the Youth Authority. The psychiatrist testified that his knowledge of the Youth Authority came "basically" from the newspapers. However, several matters were clear: (1) Gregory was to be punished, (2) Gregory needed a structured program, and (3) the structured program would be found at a site other than his home. The psychologist felt that ideally he should be in a 24-hour a day "lock up" situation for a couple of months before being placed in a home like the Ezell James Group Home. This would provide a better control of Gregory's violent propensities. The record does not explain why a boys ranch placement followed by an Ezell Home placement could not be ordered. Thus, as between the two choices, the "negative learning experience" of the Youth Authority and the affirmative atmosphere of the group home, each was convinced that the group home was better. With respect to the youngster's threat to run away if placed for a long term, the psychologist described that talk on the youngster's part as "bravado."

The prosecutor argued at the dispositional hearing that the type of facility that could be most beneficial to Gregory was simply not available. The prosecution argued: "We just don't have anything available other than Youth Authority in that regard, at least in our county, or as far as I'm aware, statewide." Thus, the prosecution's recommendation was that the youth be sent to the Youth Authority "for protection of society." There was no pretense that the youth would be benefited.

A youngster who violates the law by involving himself in a crime of violence expects to be punished. The record indicates that Gregory expected such punishment. Youngsters, however, have a greater capacity to change than do adults. Further, we as a society have a greater responsibility to attempt to socialize the young than we do with respect to adults. Finally, a youngster is far more subject to peer pressure in becoming involved in criminal behavior (as was Gregory); he can become involved in criminal behavior without yet being a hardened criminal (and Gregory was not a hardened criminal). Thus we cannot give up on the notion of rehabilitation.

The juvenile laws, since they found their way into the California statutes in 1915, support the commonsensical approach of rehabilitation and protection of society. Thus present Welfare and Institutions Code section 202 indicates that the purpose of juvenile law is "to secure for each minor" the care and guidance which will serve the "spiritual,

emotional, mental and physical welfare" of that given minor. Deterrence is also mentioned, for another purpose is to protect the "best interest of the state" and to protect the public from "criminal conduct by the minors." Also an aim is "the protection of the public from the consequences of criminal activity" of the minors and "to impose on the minor a sense of responsibility for his own acts." It seems manifest that the best rehabilitative interest of the minor, together with the protection of society, demands punishment when a crime of violence has been committed. Only retributive punishment is proscribed.

Except in the most extreme case, the law, in the case of a 13 year old, should not contemplate giving up its rehabilitative aim. The juvenile court seems to have done just that.

The reasons given by the juvenile judge for commitment to the Youth Authority (schooling, discipline and control) could also be met by a placement in a boys' ranch, or to a lesser extent, the home placement. But the *In re John H.* court, *supra,* has said that such a decision lies with the juvenile court.

There is a saving grace. The law contemplates that the Youth Authority may form its own judgment as to whether or not it will accept a youngster. (Welf. & Inst. Code, § 736.) In rare cases, perhaps this one, the Youth Authority will refuse to accept the placement.

Appellant's petition for a hearing by the Supreme Court was denied November 24, 1978. Mosk, J., and Newman, J., were of the opinion that the petition should be granted.