Filed 7/24/13  In re Nathan Z. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re NATHAN Z., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>NATHAN Z.,<br><br>        Defendant and Appellant. | A135530<br><br>(Sonoma County<br>Super. Ct. No. 36744) |

Minor Nathan Z. appeals from an order of the juvenile court imposing 730 to 800 days in juvenile hall after the court sustained a Welfare and Institutions Code section 602[1] petition alleging that Nathan had resisted arrest by a peace officer.  He asserts only one argument on appeal:  that the court abused its discretion in ordering the juvenile hall placement because such disposition did not comply with the statutory purposes of juvenile court law.  We find no abuse of discretion, and we affirm.

**BACKGROUND**

**Original Section 602 Petition**

Nathan's behavioral problems began when he was a young child.  When he was 10 years old, his problems escalated when he learned of the death of his father, whom he

_____

[1] All statutory references are to the Welfare and Institutions Code.

1

had never met.  By the time Nathan was 12, he was spiraling downward so his mother sent him away to a series of private placements in Idaho, Montana, and Utah.  After two years, Nathan's mother ran out of funds for the private placements so, in the summer of 2010, when Nathan was 14 years old, he returned home.

According to Nathan, he was traumatized by being sent away from home at a young age, as well as for being sent to various programs where there was seemingly no end in sight.  After he returned home, he was very angry with his mother, resenting her for having sent him away.

In October 2010, shortly after Nathan's return, he was arrested for possession of marijuana at school.  The matter was referred to juvenile probation, but it was not prosecuted.

On November 17, Nathan got into an argument with his mother, during which he pushed her, causing her to hit her head on a wall.  Nathan fled and remained missing for several days.  Nathan's mother called the police to report the incident, telling the officer that Nathan disregarded her rules, routinely left home without permission, and was verbally abusive toward her.  She also described an incident that occurred the previous day when, during another argument, Nathan closed his bedroom door on her hand.

Nathan was located four days later at a high school football game.  He fled when approached by police officers but was eventually apprehended and booked into juvenile hall.

On November 22, the Sonoma County District Attorney filed an original section 602 petition alleging that Nathan committed battery on his mother and resisted a peace officer.  On November 24, Nathan admitted the second count in exchange for dismissal of the first.  He was placed on formal home probation with various terms and conditions.  One such condition was that Nathan complete the Assertive Community Treatment (ACT) program.

On February 8, 2011, the probation department filed a notice of violation alleging that Nathan had tested positive for marijuana.

**Second Section 602 Petition**

On February 14, Sonoma County police officers were dispatched to investigate a report of two juveniles "tagging" a utility box with graffiti. The two juveniles, one of whom was Nathan, were apprehended. In his pocket, Nathan had two "DecoColor" pens, one of which that matched the color of the graffiti. He was booked into juvenile hall and released on community detention a few days later.

The district attorney filed a second section 602 petition, this one alleging that Nathan vandalized public property, possessed paint markers with the intent to commit graffiti, and possessed marijuana.

On February 18, Nathan admitted committing vandalism and violating probation in exchange for dismissal of the remaining two counts. The court reinstated probation.

On February 23, Nathan left his mother's home without permission and his whereabouts were unknown. The probation department filed a section 777 notice of probation violation, and the court issued a warrant for his arrest and revoked his probation.

**Third Section 602 Petition**

Nathan's whereabouts remained unknown until April 13, when an off-duty Santa Rosa police officer spotted him in the parking lot of a 7-Eleven. Knowing that Nathan had an outstanding warrant for his arrest, the officer reported the sighting to police dispatch. Two on-duty officers responded and, upon spotting them, Nathan began walking away. One of the officers attempted to detain him, and Nathan ran off. When the officer caught up with him, Nathan swung his fist, striking the officer in the face. He was ultimately detained and arrested. An April 14 section 602 petition alleged that he had resisted arrest and committed battery on a police officer.

**Fourth Section 602 Petition**

Meanwhile, an ongoing investigation linked Nathan to 18 separate acts of vandalism, and on April 15, a fourth section 602 petition was filed, charging him with felony vandalism. It was subsequently amended to add two additional counts of vandalism.

3

Nathan admitted one count of graffiti vandalism and one count of resisting arrest. The remaining counts from the April 14 and 15 petitions, as well as the section 777 petition, were dismissed.

At a disposition hearing on May 5, the juvenile court declared Nathan a ward of the court and reinstated him on home probation.

On June 29, the probation department filed a section 777 notice of probation violation after Nathan's mother reported that he had been out past curfew for 15 straight days, and on one occasion remained away from home all night without permission. Nathan also failed to remove a lock from his bedroom door as directed by his probation officer, and he failed to follow through with a court referral to the Drug Abuse Alternatives Center (DAAC). Nathan admitted the violations, and the court reinstated probation.

On July 14, Nathan was released to his mother's custody with permission to live with his grandparents, and ordered to remain on the ACT program.

**Fifth Section 602 Petition**

On July 26, Santa Rosa police received a report of a fight in progress at a local middle school. The responding officer did not see anyone fighting in the area but was directed by some bystanders to a group of kids, including Nathan, who were running away. The officer caught up with Nathan, who refused to stop running. The officer tackled him from behind and gave him a "distraction blow" to the back of the head. When Nathan failed to respond to the officer's commands to show his hands, the officer realized that Nathan, who was snoring loudly and smelled like alcohol, was passed out. He later admitted he had been drinking, claiming it was the only time he had blacked out after consuming alcohol.

On August 17, the district attorney filed another section 602 petition. This one alleged that Nathan had resisted arrest while under the influence of alcohol. The following day, the probation department filed a section 777 notice of probation violation based on the same incident. On September 1, Nathan admitted resisting arrest, and the under-the-influence allegation and probation violations were dismissed.

4

**Sixth Section 602 Petition**

On September 27, Santa Rosa police department received a report of a possible burglary. When an officer responded, he discovered Nathan, who was on searchable probation, loitering in the area. A search uncovered a "hardcover waterproof pigment ink pen," leading to Nathan's arrest.

A sixth section 602 petition charged Nathan with possession of a marking pen with intent to commit vandalism and possession of cigarettes. A section 777 notice of probation violation that followed alleged the same charges.

The probation department interviewed Nathan on October 4. Nathan advised that he would like to complete the remainder of his probation time in juvenile hall. He estimated that he had completed over half of the ACT program and would consider serving the remainder of the program in juvenile hall. As stated in the probation report, "Dispositional options were discussed with [Nathan], and Nathan was adamant that he would not comply with a suitable placement. He indicated that there was 'no way' he would cooperate, and stated if he was ordered to a suitable placement, he would simply run. He knows he would get arrested and be returned to Juvenile Hall, and then he would be ordered to serve time and dismiss, 'which is what [his] ultimate goal was anyway.' "

On October 17, Nathan admitted the probation violation, and the court dismissed the sixth petition. He was returned to the home of his mother with permission to continue living with his grandparents. The court also imposed an 60 to 90 days in juvenile hall, followed by 30 to 60 days of community detention, with the caveat that if Nathan obtained level three status at juvenile hall, he could seek release on community detention.

On January 3, 2012, Nathan's probation officer searched his bedroom and found seven plastic bags of marijuana, a glass marijuana pipe, two bottles of vodka, four lighters, and 17 marking pens. The next day, Nathan was discharged from the DAAC program for poor attendance, behavioral issues, defacing program property, and refusing to submit to a chemical test. This resulted in a section 777 notice of probation violation.

At a January 10 hearing, Nathan admitted the probation violations. The court ordered him detained at juvenile hall, finding that returning him to the home of his

mother was contrary to his welfare, as follows: "The Court is going to find that he is a danger to himself and the parents or guardians cannot maintain safety due to supervision issues and substance abuse issues. Reasonable efforts have been made to try and prevent removal through counseling, diversion, community detention, probation supervision, as well as participation in the Assertive Community Treatment program. The Court finds that the minor has violated an order of the juvenile court and the immediate protection of the minor requires continued detention." It then continued the matter to January 19 for an oral report.

At the January 19 hearing, Nathan's probation officer advised the court that all parties involved were "at the end of their ropes" with him but that, in combination with the ACT staff and his mother and grandparents, they were able to come up with a reasonable plan for him. The officer asked for 60 additional days to work with Nathan.

The court agreed to give Nathan one last opportunity to perform in the ACT program. Its intent in this regard was crystal clear: "[W]hen I say last, I don't mean it's the next to last, or we're getting close to the last or it's the next to next to last. So when you say, 'I'd like one more chance,' that's what this is. This is the one more chance for you to perform. . . . You've got to do it. And it's your attitude and it's your actions that will speak louder than anything else. If you don't follow the rules and you can't get on the program, then you are going to use those keys to unlock the juvenile hall and walk back in, and you're going to unlock the doors to either camp or placement . . . ." The court reconfirmed probation terms and conditions previously imposed, and additionally ordered Nathan to take all medication as prescribed, relinquish his cell phone, delete his Facebook page, attend three family team meetings per month as designated by the ACT program, and not password protect any electronic device, amongst other conditions. With that, the court ordered Nathan released from juvenile hall in two days to the care of his mother, grandparents, or probation officer to begin community detention for 60 to 90 days.

On February 27, Nathan removed his ankle monitoring device and absconded from community detention following suspension from school.

6

On February 29, the probation department filed a section 777 notice of violation. In a declaration in support of the department's request for a warrant, Nathan's probation officer represented that on February 27, Nathan left school without permission and did not return home, and his whereabouts remained unknown. A warrant was issued for Nathan's arrest.

**Seventh Section 602 Petition**

On March 2, a probation officer who knew Nathan had an outstanding arrest warrant spotted him walking in town and contacted a passing police officer for assistance. The officers attempted to make contact with Nathan but instead of responding to them, Nathan ran from the area. The police officer gave chase, eventually tackling Nathan to the ground in order to restrain him in handcuffs. He was placed under arrest and booked into juvenile hall.

On March 5, the district attorney filed a section 602 petition alleging one count of resisting arrest. Nathan admitted the charge, and the pending probation violation was dismissed.

Nathan's matter came on for disposition on April 10. The court began by briefly outlining Nathan's history with the juvenile court, noting that "we're kind of at the same place we were two years ago. And that's unfortunate."

The probation officer advised the court that the probation department had initially asked for an early review date and possible consideration for other programs. However, given Nathan's "pretty negative behavior in custody over the past two weeks"—which included three separate incidents in juvenile hall—the department changed its recommendation, asking that the court impose 26 months and 20 days in juvenile hall. As the department explained in its disposition report: "Sixteen-year-old [Nathan Z.] is appearing before the Court for disposition after he absconded from Community Detention following a suspension from school. Approximately five days later, the minor was contacted in the community and ran from officers. The minor's behavior with regard to the instant offense is very similar to previous referrals. Given the minor's propensity toward oppositional behavior, it would appear his defiance and resistance of authority is

7

so deep-rooted that no amount of programming or rehabilitative efforts would have an impact if he is not willing to make some significant changes. This is the minor's fourth adjudicated misdemeanor violation of 148(a)(1) [resisting arrest] since November 2010. Additionally, since being declared a ward of the Court in May 2011, he has twice absconded from Community Detention and has sustained two separate violations of probation. For the past eight months the minor has participated in the ACT Program, and during that time he has made minimal progress in addressing his issues of oppositional and defiant behavior, as well as substance abuse and academic performance. [¶] This department is discouraged by the minor's lack of insight into his behavior and his continued minimization of the offense and the events leading up to his abscondance. The minor appears incapable of accepting any responsibility for his inappropriate behavior and instead blames others for his choices. Unfortunately, this department does not perceive any reason for the minor to remain in the ACT Program at this time, as it is apparent he is no longer benefiting from community based rehabilitation efforts. This department will recommend the minor be committed to Juvenile Hall for a period of 365 days."

Nathan's counsel conceded that he had "failed probation at home." She encouraged the court, however, to consider other options, "whether it's the camp program or something like out-of-state placement. A structured program is what this young man needs." She contended that two years at juvenile hall was not going to serve him or the public and would, instead, "institutionalize him and set him up for being a problem in the community."

Nathan addressed the court, acknowledging that he had not "been the best candidate for probation" and asking for a chance at "probation camp or . . . something like that." He represented that he was scared by the prospect of two years in juvenile hall which was why, when he was suspended from school, he made an impulsive decision and ran from the police. He accepted that he deserved punishment, but pleaded with the court to give him a chance at a camp placement where he could work toward developing life

8

skills and getting a job, rather than to "just sit" at juvenile hall "with a bunch of negative peers around me . . . ."

Nathan's grandfather also spoke at the disposition hearing. He acknowledged Nathan's "attitude problem" and his transgressions, but noted that none of the charges involved violence or taking property belonging to others and opined that his offenses did not justify a lengthy commitment to juvenile hall. Instead, he urged the court to commit him to probation camp, which would provide the best opportunity for Nathan's rehabilitation. Alternatively, he asked that the court review Nathan's case every month so that camp placement could be reconsidered.

The hearing concluded with the court imposing an additional 730 to 800 days in juvenile hall, subject to the caveat that if Nathan were to achieve and maintain level three status at juvenile hall, he could schedule a request for the court to reconsider the sentence.

This timely appeal followed.

## DISCUSSION

Nathan presents one argument on appeal. He contends that the juvenile court abused its discretion when it ordered him held in juvenile hall for over two years because "the order did not comply with the statutory purposes of juvenile court law." Specifically, he claims the court erred when it found that reasonable efforts had been made to eliminate the need to remove him from his home, and it failed to consider his particularized needs when it entered the placement order. We review the juvenile court's order for abuse its discretion (*In re Todd W.* (1979) 96 Cal.App.3d 408, 416), and conclude there was no such abuse here.

The stated purpose of juvenile court law "is to provide for the protection and safety of the public and each minor under the jurisdiction of the juvenile court and to preserve and strengthen the minor's family ties whenever possible, removing the minor from the custody of his or her parents only when necessary for his or her welfare or for the safety and protection of the public." (§ 202, subd. (a).) Juvenile courts have "broad discretion to choose probation and/or various forms of custodial confinement in order to

9

hold juveniles accountable for their behavior, and to protect the public." (*In re Eddie M.* (2003) 31 Cal.4th 480, 507.)

At a disposition hearing, the court is to consider the probation officer's disposition report "and other evidence to determine an appropriate disposition. (§ 706.) In reaching a disposition, the court considers (1) the minor's age, (2) the circumstances and gravity of the offense, and (3) the minor's previous delinquent history. (§ 725.5.) The court may place the minor on probation, with or without declaring the minor a ward of the court, or it may declare the minor a ward and order appropriate treatment and placement. (§§ 725, 726.) Placement options include the home of a relative or extended family member; a suitable licensed community care facility or foster home; juvenile hall; a ranch, camp or forestry camp; and, the most restrictive setting, [Department of Juvenile Facilities]. (§§ 727, subd. (a), 730, subd. (a), 731, subd. (a)(4).)" (*In re Greg F.* (2012) 55 Cal.4th 393, 404.)

Section 726, subdivision (a) prohibits the court from removing the minor from the physical custody of his or her parent or guardian, unless the court finds that one of the following conditions is met: (1) the parent or guardian is incapable of providing or has failed or neglected to provide proper maintenance, training, and education for the minor; (2) the minor has been tried on probation while in custody and has failed to reform; or (3) the welfare of the minor requires that custody be taken from the minor's parent or guardian.

Given these guidelines, the juvenile court here was within its discretion in ordering Nathan placed at juvenile hall.

Over the two years leading up to Nathan's detention at juvenile hall, he was given extensive opportunities to right his wrongful behavior. He was permitted to live with his mother, and when it became evident that that arrangement was not beneficial, he was allowed to live with his grandparents. He was repeatedly ordered to complete the ACT and DAAC programs. He was provided mental health services, family counseling, and school assistance. Rather than taking advantage of the numerous opportunities made available to him, Nathan continued to reoffend. He twice absconded while on

10

community detention, and fled from the police four times. Over the course of two years, Nathan incurred not one, not two, but *seven* section 602 petitions, not to mention numerous probation violations. And while Nathan denied having a drug or alcohol problem, many of the allegations against him involved the use or possession of alcohol or marijuana. This record contravenes Nathan's claim that the court erred in finding that reasonable efforts had been made to eliminate the need to remove him from his home.

Nathan's claim that there was no substantial evidence that his extended family was incapable of providing the required care and guidance he needed is likewise contradicted by the record. Nathan never met his father or any of his paternal relatives. His known relatives were his mother and his maternal grandparents. Nathan's first section 602 petition was filed after he was involved in an argument that resulted in him causing physical injury to his mother. And it turned out that he had done the same thing in an argument the day before. Nathan harbored great resentment towards his mother because she had sent him to private, out-of-state placements when his behavior started spiraling out of control as a ten year old. Given this history, living in his mother's home was not an arrangement that would enable Nathan to make the changes he needed to make.

In July 2011, Nathan began living with his grandparents. In the following eight months, he incurred three more section 602 petitions and four more probation violations. There was nothing in the record suggesting that remaining in his grandparents' home was conducive to Nathan making the necessary behavioral changes. We are thus at a loss to understand his suggestion that there was a placement with extended family that would provide him with the necessary care and guidance.

The court also tailored its order to Nathan's individualized needs. As identified in the probation report, "a significant period of time in Juvenile Hall would help to improve [Nathan's] attitude and provide an opportunity for self-reflection. Furthermore, he would be able to attend school daily and maintain sobriety for an extended period of time." Additionally, the court agreed to reconsider Nathan's placement if he achieved and maintained level three status while at juvenile hall, a condition similar to that urged by Nathan's grandfather.

11

Lastly, there is no merit to Nathan's complaint that "[t]he court gave no reason for its disposition order." Such reasons need not be explicitly stated in the court's order. (See *In re Kenneth H.* (1983) 33 Cal.3d 616, 620-621 [express findings not required under section 726]; *In re John S.* (1978) 83 Cal.App.3d 285, 292 [section 726 finding need not be in exact words of statute where the substance of such finding appears in the record]; *In re Willy L.* (1976) 56 Cal.App.3d 256, 266 ["such requisite finding may be inferred from the transcript"]; *In re Ricardo M.* (1975) 52 Cal.App.3d 744, 749-751 [where the necessary findings under section 726 are expressly or implicitly made by the court and supported by the evidence, the court may impose juvenile hall time as a condition of probation].) Rather, the order will be upheld if the juvenile court's reasons for imposing the juvenile hall commitment are reflected in the transcript of the dispositional hearing and "shows clearly that [the court] found in substance that the welfare of the minor required that his custody be taken from his parent for that . . . period." (*In re John S., supra,* 83 Cal.App.3d at p. 292.) The transcript of Nathan's dispositional hearing makes the juvenile court's reasoning abundantly clear.

In sum, despite nearly two years of opportunities, Nathan's troubles continued. He had a history of absconding and fleeing from police when living with both his mother and his grandparents. He had exhausted probation's services. He had been expelled from DAAC for showing up in the influence. The court had previously warned Nathan that it was giving him one last chance, which meant *one last chance*. Despite Nathan's promises that he would change, he continued to reoffend. Given all this, we conclude that the juvenile court was within its discretion in ordering Nathan detained in juvenile hall for his maximum term of confinement.

## DISPOSITION

The juvenile court's order committing Nathan to juvenile hall for 730 to 800 days is affirmed.

           _____

           Richman, J.

We concur:

_____

Kline, P.J.

_____

Lambden, J.