[Civ. No. 20432. Third Dist. Apr. 20, 1982.]

In re ABDUL Y., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
ABDUL Y., Defendant and Appellant.

848

COUNSEL

William J. Owen and Albert W. Brodie for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Roger E. Venturi and Ramon M. de la Guardia, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

SPARKS, J.— In *Parnell* v. *Superior Court* (1976) 61 Cal. App.3d 430 [132 Cal.Rptr. 535], we held in a *per curiam* opinion that a hearing in a criminal case on a motion under Penal Code section 1538.5 for the suppression of evidence did not constitute a proceeding "relating to the merits" within the meaning of Code of Civil Procedure section 170.6. We have reexamined that ex cathedra pronouncement and, as we shall explain, find it does not withstand scrutiny. We therefore overrule *Parnell* and hold instead that a peremptory motion to disqualify the judge who had earlier conducted a suppression hearing was properly denied as untimely.

In this case a petition was filed in Sacramento County Juvenile Court alleging that Abdul Y., age 14, was a minor coming under Welfare and Institutions Code section 602 in that he had committed murder (Pen.

Code, § 187), and had used a firearm during commission of the crime (Pen. Code, § 12022.5). The minor appeals from the order sustaining the petition, declaring the minor a ward of the court and committing him to the California Youth Authority.

On appeal the minor challenges (1) the denial of his peremptory motion to disqualify the juvenile court judge as untimely (Code Civ. Proc., § 170.6); (2) the voluntariness of his confession; and (3) the order committing him to the California Youth Authority.

## FACTS

At approximately 10:30 p.m. on June 16, 1980, 15-year-old Nurah Y. telephoned her 14-year-old boyfriend, Marvin Keola, and asked him to visit her at her house. A short time later Marvin entered the Y. home through Nurah's bedroom window which she had left open. The surreptitious mode of entry was necessary because the Y. family did not approve of the relationship between Nurah and Marvin.

Mr. and Mrs. Y. were asleep during the early morning hours of that day when they were awakened by noises. Mrs. Y. attempted to enter Nurah's room to investigate, but the bedroom door was secured shut by a chair Nurah had placed against it; this allowed Marvin time to hide under Nurah's bed. Nurah then opened the door and allowed Mrs. Y. to enter. Mr. Y. was investigating the backyard area. He thereafter joined Mrs. Y. and Nurah in Nurah's bedroom.

Marvin and Nurah had been smoking marijuana that evening. Mr. and Mrs. Y. smelled the marijuana and began searching Nurah's bedroom for it. When Mr. Y. began to look near and around the bed, Nurah became frightened and ran out of the room. Mr. and Mrs. Y. continued their search and soon discovered Marvin hiding under Nurah's bed. Mrs. Y. called to appellant to come into the room.

Appellant ran into Nurah's bedroom armed with a .22 caliber semi-automatic rifle. The lights were on in the room. Marvin was lying on the floor with one leg under the bed. Appellant fired the entire clip of 15 shots at Marvin.

At approximately 3:26 a.m., Sergeant Farnsworth of the Sacramento Police Department arrived at the Y. house in response to a radio broadcast advising that a possible burglary suspect had been shot in the leg.[1] Sergeant Farnsworth was motioned into the house by Mrs. Y. He found the slain body of Marvin Keola in the house's back bedroom.

---

[1] The parties entered into a stipulation that Mrs. Y. called the police department at 3:24 a.m. on June 17th.

Officers Peters and Olson arrived at the Y. residence shortly after Sergeant Farnsworth. Officer Peters testified that he observed appellant on his bed "in a very rigid, prone position, and he was shaking very violently, and so violently ... I thought he was having an epileptic seizure." Officer Peters claimed he tried to comfort appellant by placing his hand on appellant's shoulder and asking him "if everything was okay, if he was all right." Appellant continued to shake and Officer Peters said to him "Hey, get ahold of yourself. Everything is all right. Hey, what happened." Appellant responded "I shot a burglar." After offering further consolation, the officer told appellant that he would have to know what happened in detail. Appellant claimed that he had been awakened by what sounded like a window sliding open and shortly thereafter he heard his mother say "Abdul, come quick." He grabbed his gun, ran into Nurah's bedroom, saw a crouched figure in the corner of the room, and fired all 15 rounds at the figure. Appellant told Peters that his mother then turned on the lights and he saw the individual on the floor; he maintained that he did not know the individual but had seen him in the neighborhood.

Officer Olson then returned to the kitchen area. About five minutes later appellant joined his mother and father in the living room area. Appellant and Mrs. Y. sat on a couch and consoled each other. The Y.'s then agreed to accompany the officers to the police station for the purpose of giving statements. At the station the Y.'s were placed in separate holding rooms. Detective Padovan interviewed appellant at approximately 6:30 a.m. Appellant was read his *Miranda* rights and signed a waiver form. He then made a complete confession. In that confession appellant also implicated both of his parents. Repudiating his earlier version, he stated that when he entered the room his parents were already standing over Marvin with guns in their hands. His mother, he recounted, then shot Marvin twice. Appellant then fired his rifle at Marvin until he exhausted all 15 rounds in the clip. He admitted that he shot Marvin because "I just had hate for him ... cause my sister is engaged to be married. Because he had no fucking business being with my sister."

Appellant's motion to exclude this confession was denied and the confession was admitted into evidence at the jurisdictional hearing. On December 3, 1980, the court made findings that appellant had committed murder in the second degree and had used a firearm in the commission of the offense. At the dispositional hearing, held January 7, 1981, appellant was committed to the California Youth Authority.

I

Appellant contends that the trial court erred in denying his peremptory[2] challenge of Judge Morgan under Code of Civil Procedure section 170.6. The petition to have appellant declared a ward of the court was filed on June 18, 1980. Following appellant's request for a rehearing after the case had been heard by a referee (Welf. & Inst. Code, § 252), the juvenile court reset the jurisdictional hearing for August 20, 1980. That hearing was thereafter rescheduled twice and eventually was set for November 18. In the interim, appellant filed a motion to "exclude statements and/or confessions." The motion was made on the grounds that the statements were the result of an illegal detention and arrest and were both involuntary and obtained in violation of his *Miranda* rights. The motion commenced on October 6 before Judge Morgan. It was vigorously contested, consuming all or portions of seven days. Appellant testified on his own behalf and also called his mother, a sister and a psychologist. On November 6, 1980, immediately following Judge Morgan's denial of his motion appellant made an oral motion for the court to disqualify itself voluntarily, which motion was denied.

On November 12, 1980, appellant filed a formal application to disqualify the trial judge under section 170.6. The judge ruled that the jurisdictional hearing had earlier commenced with the suppression hearing and that the motion was therefore untimely. Appellant challenges the propriety of the denial of that second motion in this appeal.

■ Code of Civil Procedure section 170.6 provides in substance that any party to an action may make a motion, supported by an affidavit of prejudice, to disqualify the trial judge, commissioner, or referee.[3] If the motion is timely and properly filed, the judge must recuse himself without further proof and the cause must be reassigned to another judge. (*Solberg* v. *Superior Court* (1977) 19 Cal.3d 182, at p. 187 [137 Cal.Rptr. 460, 561 P.2d 1148].) When an affidavit of prejudice has been timely filed, the judge's disqualification is automatic and manda-

---

[2] "'Peremptory' means that the motion results in disqualification 'without any further act or proof.' (Code Civ. Proc., § 170.6, subd. (3); see *Solberg* v. *Superior Court* (1977) 19 Cal.3d 182, 204, fn. 23 [137 Cal.Rptr. 460, 561 P.2d 1148].)" (*Wenger* v. *Commission on Judicial Performance* (1981) 29 Cal.3d 615, 624, fn. 5 [175 Cal.Rptr. 420, 630 P.2d 954].)

[3] That section has been held applicable to juvenile proceedings. (*In re Robert P.* (1981) 121 Cal.App.3d 36 [175 Cal.Rptr. 252]; *Pamela H.* v. *Superior Court* (1977) 68 Cal.App.3d 916 [137 Cal.Rptr. 612].)

All further references to section 170.6 are to the Code of Civil Procedure.

tory. (*McCartney v. Commission on Judicial Qualifications* (1974) 12 Cal.3d 512, 531-532 [116 Cal.Rptr. 260, 526 P.2d 268].) Once properly and timely challenged, the judge loses jurisdiction to proceed and all his subsequent orders and judgments are void. (*In re Jose S.* (1978) 78 Cal.App.3d 619, 628 [144 Cal.Rptr. 309].)

"The general rule established by section 170.6 is that disqualification is permitted at any time prior to commencement of the trial or hearing. Two exceptions are provided—the 10-day-5-day provision and the master calendar provision."[4] (*Los Angeles County Dept. of Pub. Social Services v. Superior Court* (1977) 69 Cal.App.3d 407, 412; fn. added [138 Cal.Rptr. 43].) The master calendar exception does not apply here because the juvenile court used a clerical rotation method of assignment rather than a master calendar system. (See *In re Robert P., supra*, 121 Cal.App.3d at p. 42; Welf. & Inst. Code, § 246.) Whether the 10-day/5-day exception applies depends upon when the "trial" commenced.

■ The People argue that although the jurisdictional hearing was formally scheduled for November 18, 1980, in practical effect it had commenced on October 6th with the hearing on the motion to exclude the confession, thereby rendering the minor's 170.6 motion untimely because not made "prior to trial." We disagree.

California Rules of Court, rule 1354(b), provides that "[u]nless a different procedure is provided for by written local rule, the court shall hear and decide any motions to suppress evidence at this time [i.e., at the beginning of the jurisdictional hearing], and prior to the attachment of jeopardy."[5] ■ Jeopardy attaches in a juvenile proceeding when

[4]These two exceptions are found in subdivision (2) of section 170.6. That subdivision provides in relevant part: "Where the judge ... assigned to or who is scheduled to try the cause or hear the matter is known at least 10 days before the date set for trial or hearing, the motion shall be made at least five days before that date. If directed to the trial of a cause where there is a master calendar, the motion shall be made to the judge supervising the master calendar not later than the time the cause is assigned for trial. In no event shall any judge ... entertain such motion if it be made ... after the making of an opening statement by counsel for plaintiff, or ... after swearing in the first witness or the giving of any evidence or after trial of the cause has otherwise commenced. If the motion is directed to a hearing (other than the trial of a cause), the motion must be made not later than the commencement of the hearing. In the case of trials or hearings not herein specifically provided for, the procedure herein specified shall be followed as nearly as may be."

[5]Section 700.1 of the Welfare and Institutions Code now provides, in relevant part, that "[a]ny motion to suppress as evidence any tangible or intangible thing obtained as a result of an unlawful search or seizure shall be heard prior to the attachment of jeopardy and shall be heard at least five judicial days after receipt of notice by the people unless the people are willing to waive a portion of this time."

the first witness is sworn at the adjudicatory phase of the jurisdictional hearing. An adjudicatory hearing "... is one at which a minor is exposed to a finding of truth of allegations contained in a petition filed pursuant to [§ 602 of the Welf. & Inst. Code]." (*In re Hurlic* (1977) 20 Cal.3d 317, 321 [142 Cal.Rptr. 443, 572 P.2d 57]; see also *Richard M. v. Superior Court* (1971) 4 Cal.3d 370, 376 [93 Cal.Rptr. 752, 482 P.2d 664].)

■ The rule thus contemplates that the jurisdictional hearing may be bifurcated into two phases, a prehearing preliminary phase and an adjudicatory one. The purpose of the rule was to avoid possible double jeopardy problems.[6]

The preliminary phase, designed for *in limine* suppression motions, is therefore the functional equivalent of the pretrial stage of adult crimi-

---

[6]"Subdivision (b) provides that, in the absence of a different procedure being provided for by local rule, the court shall, after completing matters relating to advice and appointment of counsel but before taking of the plea, ascertain whether any prehearing motions to suppress evidence are to be made in behalf of the minor and, if so, to hear and decide the motion at this time. There is no statutory or case law directly applicable to the procedural handling of these motions in the juvenile court (see Deskbook § 8.10), and as a result the procedures in each county vary. In some, these motions are heard and decided at a special hearing held in advance of the date scheduled for commencement of the jurisdiction hearing. This may require more than one appearance by some witnesses. In other counties, the motions are heard during the jurisdiction hearing as the challenged evidence is being introduced. Unlike in a criminal trial, of course, there are ordinarily no jury members being inconvenienced by the necessity for procedural interruptions in the taking of testimony on the merits of the case. (But see People v. Superior Court (Carl W.) (1975) 124 Cal.Rptr. 47, 539 P.2d 807, 15 C.3d 271 (juvenile court has discretion to appoint advisory jury).) Since Breed v. Jones (1975) 95 S.Ct. 1779, 421 U.S. 519, 44 L.Ed.2d 346, however, there is some uncertainty as to whether the petitioner would have any remedy in the event of an adverse ruling made once jeopardy has attached. (Compare In re Bradley (1968) 65 Cal.Rptr. 570, 258 C.A.2d 253 (no double jeopardy if rehearing granted by judge under section 559 following referee's dismissal of allegations); see also In re Henley (1970) 88 Cal.Rptr. 458, 9 C.A.3d 924.) To avoid a possible double jeopardy problem, the procedure suggested in this rule would require the court to hear and decide any motion to suppress evidence during the preliminary phase of the jurisdiction hearing before jeopardy attaches, i.e., before the first witness is sworn (see Breed v. Jones, supra, at 531 (when the court 'began to hear evidence')) or before an admission is accepted by the court (cf. People v. Mims (1955) 289 P.2d 539, 136 C.A.2d 828.) The motions to suppress evidence which might be heard at this stage include those relating to evidence obtained as the result of an allegedly illegal search or seizure, involuntary confession, improper identification procedure, or any other prehearing motion for an order to exclude prejudicial evidence which the minor anticipates being offered. (See Saidi-Tabatabai v. Superior Court (1967) 61 Cal.Rptr. 510, 253 C.A.2d 257.)" (Advisory Com. comment to rule 1354, Cal. Rules of Court, 23, pt. 2, West's Anno. Rules (1981 ed.) pp. 294-295 [Deering's Anno. Rules of Court (1980 ed.) p. 383].)

nal proceedings. The adjudicatory phase, on the other hand, is the juvenile court analogue to the trial in adult proceedings. The term "trial" as used in section 170.6 clearly means a hearing on the merits, i.e., the proceedings where the accused's guilt or innocence is determined. (See *People* v. *Richard* (1978) 85 Cal.App.3d 292 [149 Cal.Rptr. 344]; *Zdonek* v. *Superior Court* (1974) 38 Cal.App.3d 849 [113 Cal.Rptr. 669]. In juvenile proceedings, for purposes of section 170.6, the trial commences with the adjudicatory phase of the jurisdictional hearing. So long as the peremptory challenge motion is filed in an otherwise timely fashion before the commencement of that phase it complies with the statutory timetable even though other pretrial motions not involving contested fact issues relating to the merits have been heard and determined by the challenged judge.

Here appellant's motion was filed on November 12, 1980. The rescheduled date set for the adjudicatory phase of the jurisdictional hearing was November 18. The motion was therefore made five days before trial.[7] (*In re Robert P., supra,* 121 Cal.App.3d at p. 42; *Parnell* v. *Superior Court, supra,* 61 Cal.App.3d at pp. 431-432.) Unless that motion was required to be filed before the suppression hearing, it was otherwise timely.

The Attorney General next argues that the 170.6 motion was untimely because the hearing on appellant's motion to suppress his confession involved a "determination of contested fact issues relating to the merits."

Prior to 1965, if a party failed to exercise his section 170.6 rights before a pretrial hearing involving a contested issue of law or fact, he lost his right to peremptorily disqualify the judge. (*Swartzmen* v. *Superior Court* (1964) 231 Cal.App.2d 195 [41 Cal.Rptr. 721].) The 1965 amendment added a final sentence to subdivision (2) of that section reading: "The fact that a judge . . . has presided at or acted in connec-

---

[7]The original and postponed hearings were all assigned to department one rather than to Judge Morgan. "There is an uncertainty necessarily inherent in the practice of assigning a cause to a particular department but not to a named judge. The all too common continuance adds unknown variables. A consequent and undue hardship on the litigant flows which negates the underlying thrust of Code of Civil Procedure 170.6—to grant to the litigant a single reasonable opportunity to disqualify a *known* trial judge. To effectuate this legislative intent, the cases have evolved this rule: Where the hearing date is set, but postponed, a disqualification motion filed five days before the postponed date is timely. [Citations.]" (*In re Jose S., supra,* 78 Cal.App.3d at pp. 627-628.)

tion with a pretrial conference or other hearing, proceeding or motion prior to trial and *not involving a determination of contested fact issues relating to the merits* shall not preclude the later making of the motion provided for herein at the time and in the manner hereinbefore provided." (Stats. 1965, ch. 1442, § 1, p. 3375; italics added.)[8] That amendment was drafted and sponsored by the State Bar of California to permit the litigant to exercise his peremptory right to disqualify a judge prior to trial "notwithstanding that the judge had earlier heard demurrers and motions without challenge." (*Zdonek* v. *Superior Court, supra*, 38 Cal.App.3d at p. 852.) In the July-August 1964 issue of the State Bar Journal, the proposed legislation was explained, in pertinent part, as follows: "As to other hearings and matters before trial, it [§ 170.6] appears proper to distinguish matters before trial which involve a judicial 'determination of contested fact issues relating to the merits.' A preliminary injunction hearing, for example, may turn upon the same fact issues as are involved in a trial on the merits. Here the 'challenge' should be exercised or waived.

"But hearings on demurrers, pleading and other matters before trial are comparatively routine and should not result in waiver.

"The committee believes that the suggested change in Section 170.6, if enacted into law, will (1) conserve judicial manpower on the smaller counties; (2) reduce the number of disqualification motions statewide; (3) preserve the motion for the important situation where fact determinations are involved, such as trials; (4) recognize that preliminary motions and matters are often handled in routine fashion by an attorney other than the one who will try the case, without the presence of the client (whose views and information are important on a disqualification motion)." (Report of the Committee on Administration of Justice (1964) 39 State Bar J. 496, 498.)

Here, in making the determination that appellant's statements were voluntary and otherwise admissible, the trial court was required to resolve numerous factual conflicts in the evidence concerning the interrogation, the statements and the minor's state of mind. That hearing indisputably dealt with "contested fact issues."[9] We therefore turn

---

[8]A 1967 amendment added "court commissioner" (Stats. 1967, ch. 1602, § 2, p. 3832) and the 1976 amendment inserted "referee" as well. (Stats. 1976, ch. 1071, § 1, p. 4815.)

[9]A variety of pretrial motions have been found not to involve a determination of contested fact issues. (See, e.g., *People* v. *Montalvo* (1981) 117 Cal.App.3d 790 [173

to the question of whether the judge's resolution of the voluntariness issue was also one "relating to the merits" of the case.

■■ In *Parnell* v. *Superior Court, supra*, 61 Cal.App.3d 430, this court held, without analysis, that the judge's determination of contested fact issues in a 1538.5 motion did not relate to the merits and thus did not preclude a later motion for disqualification. We now conclude that *Parnell* was wrongly decided.

The merits of a criminal action refer to the guilt or innocence of the accused.[10] (See Pen. Code, § 1151.) That ultimate determination of culpability, by the nature of the criminal process, can only be made at a trial where jeopardy attaches. Yet it is self-evident that section 170.6 presupposes that there are proceedings "prior to trial ... relating to the merits." The adjudication of pretrial issues relating to the merits must therefore mean something other than the final determination of the accused's guilt or innocence.

The question then is whether a pretrial motion to suppress a confession relates to the merits of the prosecution. Incriminating evidence sought to be introduced against a defendant relates, by definition, to the guilt of the accused and is relevant because it has a "tendency in reason to prove or disprove [a] disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Hence a contested pretrial factual hearing to determine the admissibility of incriminating evidence necessarily involves an adjudication that is of consequence to

---

Cal.Rptr. 51] (plea bargain); *In re Jose S., supra*, 78 Cal.App.3d 619 (in chambers review of polygraph report); *People* v. *Hunter* (1977) 71 Cal.App.3d 634, 638 [139 Cal.Rptr. 560] (motion to amend information); *Los Angeles County Dept. of Pub. Social Services* v. *Superior Court, supra*, 69 Cal.App.3d at p. 417 [138 Cal.Rptr. 43] (motion to transfer and motion for continuance); *Zdonek* v. *Superior Court, supra*, 38 Cal.App.3d 849 (demurrer to complaint); *Fraijo* v. *Superior Court* (1973) 34 Cal. App.3d 222, 225 [109 Cal.Rptr. 909] (plea bargain); *Kohn* v. *Superior Court* (1966) 239 Cal.App.2d 428, 430 [48 Cal.Rptr. 832] (motion to dismiss pursuant to Pen. Code, § 995); *Hospital Council of Northern Cal.* v. *Superior Court* (1973) 30 Cal.App.3d 331 [106 Cal.Rptr. 247] (motion for judgment on the pleadings).)

[10]If pleas other than not guilty have been entered, the merits would also refer to the ultimate facts tendered by those pleas. It is also true that a proceeding in the juvenile court involving a penal offense is not technically a criminal proceeding. (Welf. & Inst. Code, § 203.) "However, the "'civil" label-of-convenience' (*In re Gault*, 387 U.S. 1, 50 [18 L.Ed.2d 527, 558, 87 S.Ct. 1428]) cannot obscure the quasi-criminal nature of juvenile proceedings, involving as they often do the possibility of a substantial loss of personal freedom." (*Joe Z.* v. *Superior Court* (1970) 3 Cal.3d 797, 801 [91 Cal.Rptr. 594, 478 P.2d 26].) For purposes of this analysis, therefore, the quasi-criminal nature of juvenile proceedings are indistinguishable from adult criminal actions.

the determination of the legal guilt or innocence of the accused. Such a hearing is also necessarily one "involving a determination of contested fact issues relating to the merits . . . ." We therefore conclude that a pretrial hearing relates to the merits of a criminal action within the meaning of section 170.6 when it involves a determination of the admissibility of evidence tending to establish the guilt or innocence of the accused. ■ By a parity of reasoning, a pretrial hearing relates to the merits of a juvenile proceeding when it involves a determination of the admission of evidence tending to prove or disprove that the minor is a person described by Welfare and Institutions Code section 602. ■ This conclusion is especially compelled when the contested hearing involves a confession. Indeed, our Supreme Court has noted that a confession is the "most devastating evidence of [a defendant's] guilt . . . ." (*People* v. *Jiminez* (1978) 21 Cal.3d 595, 607 [147 Cal.Rptr. 172, 580 P.2d 672].)

Moreover, the importance and magnitude of the pretrial suppression hearing suggests that this is not the kind of "comparatively routine" pretrial matter that "should not result in waiver" of disqualification rights under section 170.6. (See Report, *supra*, 39 State Bar J. at p. 497.)

In a different context, Justice Blackmun noted the importance of suppression hearing in the criminal process: ". . . the suppression hearing resembles and relates to the full trial in almost every particular. Evidence is presented by means of live testimony, witnesses are sworn, and those witnesses are subject to cross-examination. Determination of the ultimate issue depends in most cases upon the trier of fact's evaluation of the evidence, and credibility is often crucial. . . . [¶] Moreover, the pretrial suppression hearing often is critical, and it may be decisive, in the prosecution of a criminal case. If the defendant prevails, he will have dealt the prosecution's case a serious, perhaps fatal, blow; the proceeding often then will be dismissed or negotiated on terms favorable to the defense. If the prosecution successfully resists the motion to suppress, the defendant may have little hope of success at trial (*especially where a confession is in issue*), with the result that the likelihood of a guilty plea is substantially increased. *United States* v. *Clark*, 475 F.2d 240, 246-247 (CA2 1973); *United States* v. *Cianfrani*, 573 F.2d, at 848-851. [¶] The suppression hearing often is the only judicial proceeding of substantial importance that takes place during a criminal prosecution. . . ." (*Gannett Co.* v. *DePasquale* (1979) 443 U.S. 368, 434 [61 L.Ed.2d 608, 655-656, 99 S.Ct. 2898] (conc. and dis. opn. of Blackmun, J.; italics added.)

If litigants are entitled to disqualify judges following such crucial pretrial suppression hearings, they would frustrate the policy of section 170.6 against permitting litigants "to gamble on obtaining a favorable decision from one judge, and then, if confronted with an adverse judgment, allow them to disqualify him ... in the hope of securing a different ruling from another judge ...." (*Jacobs* v. *Superior Court* (1959) 53 Cal.2d 187, 191 [1 Cal.Rptr. 9, 347 P.2d 9]; see also *People* v. *Richard, supra*, 85 Cal.App.3d at p. 299.) Foreclosing disqualification motions following the determination of "contested fact issues relating to the merits" in suppression hearings will have the salutary effect of minimizing the opportunity for "judge-shopping," i.e., of removing the assigned judge from the case on grounds other than a belief he is personally prejudiced. (See *Jacobs* v. *Superior Court, supra*, 53 Cal.2d at p. 191.)

The minor's attempted peremptory disqualification of Judge Morgan after the suppression hearing was untimely as a matter of law. Therefore, although the trial court's reason for denying appellant's disqualification motion was erroneous, its decision was correct and is accordingly entitled to be upheld on appeal. (See *People* v. *Braeseke* (1979) 25 Cal.3d 691, 700 [159 Cal.Rptr. 684, 602 P.2d 384]; *People* v. *Grana* (1934) 1 Cal.2d 565, 571 [36 P.2d 375]; *People* v. *Towner* (1968) 259 Cal.App.2d 682, 685 [66 Cal.Rptr. 559]; *Davey* v. *Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117].)

## II

Appellant next challenges the admissibility of the confession he made at the police station. He argues that the court erred in ruling his confession was voluntarily given. The salient facts surrounding that confession are as follows:

Mr. and Mrs. Y. and appellant voluntarily agreed to be transported by the police to the police station to give statements. They were transported in an unmarked police car with no cage in it. Handcuffs were not used. They arrived at the station at approximately 5 a.m. The police believed at that time that the Y.'s were merely innocent witnesses to the slaying of a burglar. At the police station, the three Y.'s were placed in separate "holding rooms" while waiting to be interviewed.[11]

---

[11]The "holding rooms" are approximately four feet by six feet and contain a single chair; the doors lock when closed. It is the practice in Sacramento County to place wit-

Detective Charles Padovan conducted the interviews. His initial impression of the case was that appellant had shot and killed a burglar. This impression changed when he interviewed Nurah Y., who stated that her father had found the victim under the bed, that he had a handgun pointed at the individual, and that she at that point ran out of the house.

Appellant was interviewed at approximately 6:30, about one and one-half hours after leaving his residence. Prior to commencing questioning, he was properly advised of his *Miranda* rights; he indicated his understanding of them and signed a waiver form. The minor then made a full confession of the killing of Marvin Keola, which was admitted into evidence at the jurisdictional hearing.

■ The use in a juvenile proceeding of a confession obtained without an intelligent, knowledgeable waiver of constitutional rights violates the Fifth Amendment and the due process clause of the Fourteenth Amendment of the United States Constitution. (*In re Gault* (1967) 387 U.S. 1 [18 L.Ed.2d 527, 87 S.Ct. 1428]; *People v. McClary* (1977) 20 Cal.3d 218 [142 Cal.Rptr. 163, 571 P.2d 620].) In the absence of such a waiver statements made by a minor while in custody are inadmissible in a juvenile court proceeding instituted under Welfare and Institutions Code section 602. (*In re Roderick P.* (1972) 7 Cal.3d 801 [103 Cal.Rptr. 425, 500 P.2d 1].) Also, a minor's request to see one of his parents has been construed as an invocation of the minor's Fifth Amendment rights, requiring that questioning must then immediately cease. (*People v. Burton* (1971) 6 Cal.3d 375, 383-384 [99 Cal.Rptr. 1, 491 P.2d 793].)

The involuntary or voluntary nature of a confession must be tested by "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226 [36 L.Ed.2d 854, 862, 93 S.Ct. 2041]; see also *Fare v. Michael C.* (1979) 442 U.S. 707, 725 [61 L.Ed.2d 197, 212, 99 S.Ct. 2560].) ■ "The burden is upon the prosecution to establish that an accused's statements are voluntary; the burden is greater in the case of a juvenile than the case of an adult. (*In re Gault* (1967) 387 U.S. 1, 55 [18 L.Ed.2d 527, 561, 87 S.Ct. 1428];

nesses in separate rooms to ensure that their statements remain free from the taint of others. Questioning takes place in a larger interview room equipped with recording machinery.

*Gallegos* v. *Colorado* (1962) 370 U.S. 49, 54 [8 L.Ed.2d 325, 328, 82 S.Ct. 1209, 87 A.L.R.2d 614].)" (*People* v. *Alfieri* (1979) 95 Cal.App. 3d 533, 544-545 [157 Cal.Rptr. 304].) Minority itself, however, will not invalidate a minor's confession obtained after the minor's waiver of his *Miranda* rights. (*People* v. *Lara* (1967) 67 Cal.2d 365, 383 [62 Cal.Rptr. 586, 432 P.2d 202].)

██ Appellant first contends that his confession is inadmissible because prior to police interrogation he should have been allowed to speak with his parents or his sister Ophelia. There is a conflict in the evidence as to whether Mr. and Mrs. Y. and Ophelia requested to see defendant. As a reviewing court, we accept, as we are required to do, that version of events most favorable to the People (see *People* v. *Jiminez, supra*, 21 Cal.3d at p. 609); in this case that no such requests were made. Anticipating this result, appellant argues that the police should have either obtained his parents' consent, or informed appellant he could speak to his parents or to his sister. He urges that the failure of the police to take such affirmative action, under the facts presented here, makes his confession inadmissible.

In *People* v. *Lara, supra*, 67 Cal.2d at page 379, the Supreme Court, admonishing that in police interrogation of juveniles the advice and consent of an adult is "to be desired, and should be obtained whenever feasible," held (at p. 383) that as a general rule "a minor has the capacity to make a voluntary confession, even of capital offenses, without the presence or consent of counsel or other responsible adult, and the admissibility of such a confession depends not on his age alone but on a combination of that factor with such other circumstances as his intelligence, education, experience, and ability to comprehend the meaning and effect of his statement." In other words, failure to seek and obtain adult consent is but one of several factors to be considered by the trial judge in determining the admissibility of a confession.[12] (See *In re Patrick W.* (1978) 84 Cal.App.3d 520, 525 [148 Cal.Rptr. 735]; *In re Anthony J.* (1980) 107 Cal.App.3d 962, 974 [166 Cal.Rptr. 238].)

This is not a case in which we are asked to decide whether the confessor, by some conduct, has manifested an intent to invoke his Fifth

---

[12]We are aware of the view that a minor is not competent to waive his rights without the consent of an adult, urged by the dissent in *Lara, supra*, 67 Cal.2d at page 395, and also the concurring opinion in *In re Patrick W.* (1980) 104 Cal.App.3d 615, at page 619 [163 Cal.Rptr. 848]. We decline to adopt that view.

Amendment privilege. (See *People* v. *Burton, supra*, 6 Cal.3d at p. 384; *People* v. *Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323]; *People* v. *Fioritto* (1968) 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625].) Rather, the question here is whether, under the totality of circumstances, appellant had the ability, capacity and willingness to give a knowledgeable waiver and hence to confess voluntarily to the crime or whether his will was actually overborne. (*People* v. *Lara, supra*, 67 Cal.2d 365; *In re Dennis M.* (1969) 70 Cal.2d 444 [75 Cal.Rptr. 1, 450 P.2d 296]; *In re Anthony J., supra*, 107 Cal.App.3d at p. 974.) Accordingly, it is in the context of the totality of circumstances that we examine appellant's specific contentions that the authorities should have sought consent from appellant's parents or inquired whether appellant wished to speak to his parents or his sister.

Appellant's sister, Ophelia Toney, arrived at the police station at approximately 5:30 a.m. in response to a call from her mother. Appellant's parents were in a room adjacent to appellant. Obviously, all were family members whose consent was "feasible." (*People* v. *Lara, supra*, 67 Cal.2d at p. 379.) However, we conclude that, under the totality of circumstances, failure to seek and obtain their consent did not render the confession inadmissible.

The record reveals that appellant's parents were present when appellant shot Marvin Keola, and therefore knew of his involvement in the killing. However, up until the time that Detective Padovan interviewed Nurah at the police station (approximately 5 a.m.), the police did not suspect appellant of criminal homicide. The preliminary police investigation at the Y. residence was conducted according to the report received by the police dispatcher from Mrs. Y. over the telephone that a burglar had been shot. The parents were permitted to talk privately with appellant and to move freely in and about the house. Mr. and Mrs. Y. were present when appellant agreed to travel to the police station to make a statement. At the station no request was made by appellant or his parents to speak to each other, though they knew they were in adjacent rooms. Their acquiescence in his decision to submit to questioning is tantamount to implied parental consent. Under these circumstances, we conclude that the failure to seek and obtain express consent from the parents before questioning appellant did not render the confession involuntary.

■ Appellant relies on *In re Patrick W., supra,* 84 Cal.App.3d 520[13] to support his contention that the authorities should have informed appellant of his sister's presence in the police station. In *Patrick,* a 13-year-old minor shot and killed his stepfather. Before waiving his *Miranda* rights, the following colloquy took place: [Police]: "[d]o you want an attorney or not? [Minor]: I'm not sure, I'll have to talk to my parents, to my mother. I don't know. [Police]: Okay, do you want to see your mother? [Minor]: No, not really. Just answer questions whatever you want or—[Police]: You just want to talk about the case, huh? [Minor]: I guess. [Police]: Get it all out. [Minor]: What—whatever you want is fine, right."

The *Patrick* court held that "the recommendation in *People v. Lara, supra,* 67 Cal.2d 365 [that consent be obtained whenever feasible] . . . comes close to being a mandate when dealing with a 13-year-old boy suspected of murder. The minor had already voiced difficulty in facing his mother, whom he rightly assumed to be highly distraught at the time. If he had been made aware of his grandparents' concerns and that they were near there is good reason to believe that he would have sought their advice before responding to the officers' questions." (*Id.,* at p. 526.) We cannot say with the same degree of certainty here that appellant would have sought Ophelia's advice had he been aware she was in the police station. Appellant was unequivocal in his waiver of *Miranda* rights. Further, unlike the minor in *Patrick,* appellant had not been isolated from family members. Finally, in *Patrick* the court noted that the minor "would not, of course, have been likely to fully 'comprehend the meaning and effect of his statement.' (*People v. Lara, supra,* 67 Cal.2d at p. 383.)" (*Id.,* at p. 526); here we are satisfied that appellant had sufficient capacity and experience to comprehend the meaning of his waiver. Mrs. Y. testified that appellant had previously been to juvenile hall. On that occasion a probation officer had explained to appellant his *Miranda* rights. Even before he went in to talk to the probation officer, Mrs. Y. had also explained what the rights meant, that he had the right not to speak and that he had a right to an attorney. We find it significant that Ophelia was not implicated in the crime and might have been able to offer objective, helpful advice to the minor— the kind of advice not available from his parents, who were implicated

---

[13]After the California Supreme Court denied hearing in *Patrick,* June 25, 1979, the United States Supreme Court remanded the case back to the Court of Appeal for "further consideration in light of *Fare v. Michael C.* (1979) 442 U.S. 707." On remand, the *Patrick* court reaffirmed its earlier opinion, concluding that *Fare* did not compel a different result on the facts presented. (See *In re Patrick W., supra,* 104 Cal.App.3d 615.)

in the crime. It is fair to say that her presence at the police station was compelled by the desire to comfort and talk to family members. However, we cannot conclude, as appellant urges, that the failure of the authorities to inform appellant of his sister's presence rendered the confession inadmissible.

██ Appellant called Dr. Grant Hutchinson, a clinical psychologist, who testified that appellant was not capable of making a knowing and intelligent waiver of *Miranda* rights.[14] He cited the following factors to support his conclusion: (1) appellant's age and immaturity, (2) his inexperience with the law, e.g., the fact "that he had [not] previously encountered *Miranda* or the court system directly,"[15] (3) his submissiveness to authority figures,[16] (4) appellant's lack of sleep at the time of the confession, (5) his emotional condition, and (6) the fact that appellant was confined to a room for one and one-half hours without contact with parents, family, or friends. However on cross-examination Dr. Hutchinson also testified that appellant is of average or slightly above average intelligence, and that, although of foreign ancestry, he speaks and understands English well. He conceded that appellant had no psychiatric disorders that would inhibit understanding. Further, when Dr. Hutchinson asked appellant why *Miranda* rights are read to persons, appellant exhibited a clear understanding that he had a choice of talking or not talking, and that anything he said "could be used against me . . . as evidence." When Dr. Hutchinson questioned appellant about the meaning of the *Miranda* admonition that he had a right to an attorney, appellant responded "You could call an attorney and if you can't afford it, they give you a public defender." When queried as to how you get an attorney, appellant responded "Ask for one." This testimony casts doubt on Dr. Hutchinson's conclusion that appellant's waiver was not knowing and voluntary. In any event, the trial court was not required to accept Dr. Hutchinson's opinion with respect to appel-

---

[14]Hutchinson formed his conclusion based on (1) the police reports prepared by Officers Olson and Peters concerning their conversations with appellant at approximately 3:30 a.m. on June 17th; (2) the confession taken by Detective Padovan later the same morning; and (3) an interview with appellant, lasting about three hours, that took place at juvenile hall on August 20th.

[15]Reliance on this factor was substantially undermined by Mrs. Y.'s testimony later in the hearing that appellant had been to juvenile hall on a previous occasion at which time she fully explained to him the meaning of his *Miranda* rights.

[16]Hutchinson's opinion regarding appellant's submissiveness was based entirely on the doctor's interview with him—he did not attempt to contact appellant's teachers, people at appellant's church, or family members.

lant's mental condition at a time he did not observe him. (*People* v. *Gurley* (1972) 23 Cal.App.3d 536, 550 [100 Cal.Rptr. 407].)

We have, of course, listened to the tape of appellant's confession. No coercion may be found in the manner in which the interrogation was conducted. Moreover, at no time did appellant indicate in any manner that he wanted questioning to cease. ■■ ■■■■ We conclude, based on an independent examination of the record (see *People* v. *Sanchez* (1969) 70 Cal.2d 562, 571-572 [75 Cal.Rptr. 642, 451 P.2d 74]), that appellant's confession was made voluntarily after a knowing and intelligent waiver of his rights.[17]

### III

At the conclusion of the adjudicatory hearing on December 3, 1980, the trial judge adjudged appellant a ward of the court pursuant to Welfare and Institutions Code section 602, finding that he had committed murder in the second degree (Pen. Code, § 187), and had used a firearm during commission of the crime (Pen. Code, § 12022.5).[18]

■ At the January 7, 1981, dispositional hearing, appellant was committed to California Youth Authority. Appellant contends that the

---

[17]Appellant also contends that his confession was inadmissible because he should have been taken to a probation officer prior to questioning. This contention is meritless. Welfare and Institutions Code sections 625 and 626 provide in substance that when a minor is taken into temporary custody for a suspected violation of Welfare and Institutions Code sections 601 or 602, the authorities must thereafter act "without unnecessary delay" to deliver the minor to the probation officer. "In no case shall he delay the delivery of the minor to the probation officer for more than 24 hours if such minor has been taken into custody without a warrant in the belief that he has committed a misdemeanor." The purpose of the meeting with the probation officer is to "determine whether such detention is appropriate." (*In re Wayne H.* (1979) 24 Cal.3d 595, 601 [156 Cal.Rptr. 344, 596 P.2d 1].)

The provisions of sections 625 and 626 are inapplicable here. First, appellant was not "taken into custody" by police, but rather voluntarily agreed to accompany the police to the police station as a potential witness. He did not become a suspect until *after* arrival at the station. Second, appellant was later suspected of murder, a felony; section 626 by its terms applies only to misdemeanors. Finally, even if the police failed to deliver the minor to a probation officer within 24 hours, this would not ordinarily be a factor in determining whether a confession given *prior to* the running of that time period was voluntary and therefore admissible.

[18]The prescribed term for second degree murder is 15 years to life; a 2-year enhancement was imposed for the use finding. Appellant was ordered to remain at CYA not past his 21st birthday.

juvenile court abused its discretion by committing him to CYA because there was an alternative disposition available and such commitment is justified only as a last resort. We disagree.

It is true that a CYA commitment is "the final treatment resource" available to the juvenile court. It is thus treated as a placement of "last resort," proper ·only in the most serious cases after all else has failed. (*In re Aline D.* (1975) 14 Cal.3d 557, 564 [121 Cal.Rptr. 816, 536 P.2d 65].) The Juvenile Court Law "'contemplates a progressively restrictive and punitive series of disposition orders in cases such as that now before us—namely, home placement under supervision, foster home placement, placement in a local treatment facility and, as a last resort, Youth Authority placement.'" (*Id.*, at p. 564; see also *In re Ricky H.* (1981) 30 Cal.3d 176, 183 [178 Cal.Rptr. 324, 636 P.2d 13]; *In re Bryan* (1976) 16 Cal.3d 782, 788 [129 Cal.Rptr. 293, 548 P.2d 693]; *In re Arthur N.* (1976) 16 Cal.3d 226, 237 [127 Cal.Rptr. 641, 545 P.2d 1345].) "Nonetheless, there is no absolute rule that a Youth Authority commitment should never be ordered unless less restrictive placements have been attempted. [Citations.]" (*In re Ricky H., supra*, 30 Cal.3d at p. 183.)

"The decision of the juvenile court may be reversed on appeal only upon a showing that the court abused its discretion in committing the minor to CYA. An appellate court will not lightly substitute its decision for that of the juvenile court, as the former must indulge in all reasonable inferences in support of the latter's decision and will not disturb it unless unsupported by substantial evidence. [Citations.]" (*In re Eugene R.* (1980) 107 Cal.App.3d 605, 617 [166 Cal.Rptr. 219].) No abuse has been shown here.

The trial judge held that the purposes of the Juvenile Court Law[19] would not be accomplished by a facility other than the Youth Author-

---

[19]The general statutory purposes of the Juvenile Court Law are stated in Welfare and Institutions Code section 202 which provides: "(a) The purpose of this chapter is to secure for each minor under the jurisdiction of the juvenile court such care and guidance, preferably in his own home, as will serve the spiritual, emotional, mental, and physical welfare of the minor and the best interests of the state; to protect the public from criminal conduct by minors; to impose on the minor a sense of responsibility for his own acts; to preserve and strengthen the minor's family ties whenever possible, removing him from the custody of his parents only when necessary for his welfare or for the safety and protection of the public; and, when the minor is removed from his own family, to secure for him custody, care, and discipline as nearly as possible equivalent to that which should have been given by his parents. This chapter shall be liberally construed to carry out these purposes. [¶] (b) The purpose of this chapter also includes the

ity. Specifically the judge found that: (1) "removal from the community" was necessary to protect society and could not be adequately accomplished in a camp or group because they are not lockup facilities; (2) long-term incarceration was needed for appellant's rehabilitation and a camp or ranch disposition would not suffice because of the time needed for such treatment;[20] (3) CYA commitment was preferable to other alternatives because of the psychiatric facilities there; and (4) the minor's mental and physical condition was such as to render it probable that he would benefit by the "reformatory, educational and discipline . . . provided by the Youth Authority . . . ."

Although appellant is a first-time offender, this in itself does not indicate that CYA commitment is inappropriate. (*In re Michael R.* (1977) 73 Cal.App.3d 327, 340 [140 Cal.Rptr. 716]; *In re Willy L.* (1976) 56 Cal.App.3d 256, 264 [128 Cal.Rptr. 592].) Appellant's criminal conduct was extremely serious.[21] Moreover, appellant has a history of aggressive (though nonadjudicated) conduct that supports the conclusion that incarceration in a lockup facility was necessary to promote rehabilitation and protect society.[22] Unlike the minor in *In re Todd W.*

---

protection of the public from the consequences of criminal activity, and to such purpose probation officers, peace officers, and juvenile courts shall take into account such protection of the public in their determinations under this chapter."

[20]Jerry Chase, representing the Sacramento County Probation Department, testified at the dispositional hearing that the duration of the program at the boys ranch is four to ten months.

[21]In *In re Carrie W.* (1979) 89 Cal.App.3d 642 [152 Cal.Rptr. 690], the court listed some examples of serious cases for which CYA commitment might be appropriate. These included ". . . *In re John H.* (1978) 21 Cal.3d 18 [145 Cal.Rptr. 377, 577 P.2d 177] [current offense consisted of robbery during which great bodily injury inflicted on the victim; record revealed lengthy history of gang involvement and several prior violent offenses]; *In re Robert W.* (1977) 68 Cal.App.3d 705 [137 Cal.Rptr. 558] [record revealed 22 arrests (6 involving crimes of violence), numerous ineffective prior placements, recommendations of CYA commitment]; *In re Zardies B.* (1976) 64 Cal.App.3d 11 [134 Cal.Rptr. 181] [current offenses were yelling at teacher and being disruptive at school; record revealed grand theft and burglary]; *In re Willy L.* (1976) 56 Cal.App.3d 256 [128 Cal.Rptr. 592] [record revealed serious pattern of delinquent behavior, including major burglary and drug offenses]; *In re Clarence B.* (1974) 37 Cal.App.3d 676 [112 Cal.Rptr. 474] [current offense involved two rapes and an act of oral copulation; record revealed involvements in one incident of shoplifting, three incidents of joyriding, and an incident of possession of marijuana.])" (*Id.*, at p. 649.)

[22]School records from John Still Junior High show that appellant was involved in numerous fights; he was found on campus in possession of a knife with a locked blade and a razor box cutter; and when reprimanded he threw things in the classroom and would

(1979) 96 Cal.App.3d 408 [157 Cal.Rptr. 802], cited by appellant, where the court reversed a CYA commitment, we cannot say that appellant's "criminal profile bore no resemblance to the history of assaultive, violent behavior engaged in by the seven or eight 13-year-olds who formed the select group committed to CYA in fiscal year 1977-78." (*Id.,* at p. 419.)

Appellant correctly points out that the fact that a minor has committed a serious offense is not a ground, in and of itself, for a Youth Authority commitment. (*In re Lawrence B.* (1976) 61 Cal.App.3d 671, 674, 677 [132 Cal.Rptr. 599]; *In re Michael R., supra,* 73 Cal.App.3d at p. 337.) "Underlying this view is the rationale that commitment solely on such grounds 'would be punitive in effect' (*In re Lawrence B., supra,* 61 Cal.App.3d at p. 677; *In re J. L. P.* [1972] 25 Cal.App.3d 86, at p. 89 [100 Cal.Rptr. 601]) and, therefore, contrary to the rehabilitative purpose of the Juvenile Court Law." (*In re Michael R., supra,* 73 Cal.App.3d at p. 337.) The record in this case, however, clearly indicates that Youth Authority commitment was predicated on factors other than a desire to punish appellant because of the seriousness of the offense. Specifically, the court noted the need for a lockup facility to protect society and the need for and availability of reformatory, education and psychiatric programs at the Youth Authority. In addition, a social study report of appellant was prepared by the county probation department for the dispositional hearing, stated that the minor's parents downplay his assaultive conduct and that he was apparently not punished for his aggressive behavior toward others. Further, the report noted that it was also "acceptable" for appellant to possess weapons.[23] For these reasons, the prospects for rehabilitation would seem better in

---

leave the room without permission; on one occasion, when sent to the school office because found in possession of a knife, he became violent, kicked a wastebasket, and banged things until the school's police officer was called. He accumulated 21 referrals for inappropriate behavior at John Still Junior High and had exhibited a "horrible temper" on campus. He was transferred to Leland Stanford Junior High in February 1979, and the violent behavior continued: in March 1979, he was disciplined twice for hitting other students; in April 1979, he threatened a substitute teacher and intimidated another student. On April 27, 1979, appellant was cited for battery by the Sacramento Police Department for striking and kicking another juvenile; he admitted the battery. Appellant's behavior improved following the summer of 1979. Starting in March 1980, he hit students on three occasions, picked a student off the ground by the neck, was insolent, and repeatedly tardy; by the end of school in June 1980, appellant had accumulated 48 disciplinary referrals at Leland Stanford Junior High.

[23]Appellant always kept a rifle loaded in his bedroom and believed that keeping loaded weapons in the house was not unusual since no small children had access to the family weapons.

CYA than in a ranch where he would be eligible to return home in four to ten months.

The judgment is affirmed.

Blease, Acting P. J., and Carr, J., concurred.

A petition for a rehearing was denied May 14, 1982, and appellant's petition for a hearing by the Supreme Court was denied July 14, 1982. Bird, C. J., was of the opinion that the petition should be granted.