Filed 7/16/25  In re J.T. CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| In re J.T., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B335916 (Super. Ct. No. 2020032421) (Ventura County) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>J.T.,<br><br>    Defendant and Appellant. | |

J.T. appeals from the juvenile court's order sustaining the allegations of a Welfare and Institutions Code section 602 petition that he committed attempted murder (Pen. Code, §§ 187, subd. (a), 664, count 1) and first degree residential robbery (Pen. Code, § 211, count 2).  Appellant, who had just turned 16 years old five days prior to the offenses, contends the juvenile court

erred by admitting his post-*Miranda*[1] statements to the police in violation of his Fifth and Fourteenth Amendment rights. We affirm.

*The Crime and Police Investigation*

On November 1, 2020, around noon, appellant entered the home of 86-year-old Nancy McAtee armed with a knife and a BB gun. McAtee lived with her son, Kenneth McAtee, who was at work at the time. As McAtee walked to her bathroom, appellant grabbed her and pulled her inside the bathroom. He had what appeared to McAtee to be a silver metal gun. Appellant demanded money and threatened to shoot McAtee when she said she did not have any money. Appellant then stabbed McAtee several times. When McAtee fell to the floor, appellant continued to stab her and threatened to shoot her if she screamed. He said he would call 911 if she cooperated. He demanded drugs and McAtee's car keys.

While McAtee remained in the bathroom, appellant ransacked her home. He returned to the bathroom multiple times to ask for additional information about other items in the house. He plugged the sink and attempted to flood the bathroom. He disconnected the landline phone by yanking it out of the wall. A neighbor called police to report a burglary after she observed appellant trying to get into McAtee's car. When neighbors later entered McAtee's home, they found her laying in the hallway. She was conscious and able to communicate. She believed she had been in the bathroom for approximately two-and-half hours before paramedics arrived.

Dr. Barry Sanchez, a trauma surgeon, reviewed McAtee's medical records related to her injuries. McAtee suffered

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

numerous lacerations, including to her face, neck, arms, back, and shoulder. She also suffered chest wounds, fractured ribs, and blunt force trauma to her legs. Dr. Sanchez opined that several of the lacerations were near arteries and veins, which if damaged, could have caused death by blood loss "very quickly." Dr. Sanchez also opined that due to McAtee's advanced age, she was much more vulnerable to fatal injuries than someone who was under the age of 65.

Port Hueneme Police Department Officer Rocque Lopez responded to a report of a vehicle burglary in progress. The description of the suspect was "a Hispanic male; black hat; black mask; . . . gray, white, and black jacket; . . . dark pants that were cuffed at the legs; black shoes." When Officer Lopez arrived at the residence, he observed a person matching the description of the suspect "exiting the side of the residence" and "walking out through a cut in the . . . chain-link fence from the rear yard to the front yard." When appellant saw Officer Lopez, he attempted to flee on foot. Appellant's BB gun was later found along the path of the foot chase.

After a brief pursuit, Officer Lopez detained appellant. When Officer Lopez searched appellant, he found several items, including: a pocketknife with a four-inch blade and four-inch handle that was locked in the open position; a receipt from Jack-in-the-Box located near the area for a sandwich purchased at 11:07 a.m.; a bindle of what appeared to be methamphetamine in appellant's sock, a glass methamphetamine pipe, two cell phones, and three sets of keys, the victim's diabetic logbook, a pass for Magic Mountain with Kenneth's name on it, and various other bank cards belonging to a "German Juarez."

3

Appellant was wearing a mask during the pursuit and when he was apprehended.  He wore a black cloth glove on his right hand and a tube sock on the other.  Officer Lopez identified a photograph depicting appellant's clothing, which was either black and white, or gray and black.  Appellant was wearing a "Raiders" hat, a bandana, an oversized "Pendleton" jacket and shirt, baggy jean pants with the pant legs cuffed, and black shoes.  There was a stain on appellant's pant leg.

When Kenneth arrived home, he saw that appellant was wearing his jacket that he kept in his bedroom closet.  Kenneth looked over the possessions seized from appellant and recognized his Magic Mountain season pass, car keys that belonged to his mother, and a set of keys that belonged to his grandmother from approximately 15-20 years prior.  Kenneth also noticed his guns and bass guitar were sitting next to his mother's vehicle on the driveway.  He recognized additional items that had been inside his home that morning and observed that the house had been ransacked.

Officer Lopez transported appellant to the police station in his patrol car.  When they reached the station, appellant asked Officer Lopez whether "the lady" would be "okay" and "make it," and whether he would be "charged for the guns."  Appellant was not being questioned at the time.

At the station, appellant was searched and a bindle of drugs fell out of his shoe.  His clothing and the knife were booked into evidence.

A forensic analyst with the Ventura County Sheriff's Office Forensics Services Bureau tested the stains found on the knife and jeans seized from appellant.  The blood on appellant's pants was determined to be McAtee's blood.  However, the laboratory

4

was not able to properly test the blood-like substance on the knife.

Appellant was taken into custody at 2:42 p.m. He arrived at the station at 3:00 p.m. At approximately 8:30 p.m., Officer Tapia and Sergeant Torpey noticed appellant appeared to be sleeping. They woke him up and walked him to an interview room. The interview was audio recorded and lasted approximately one hour. At the outset of the interview, appellant was read his *Miranda* rights. When asked if he understood, appellant responded, "hm-mmm." He repeated this response each time he was asked if he understood. When asked to clarify whether his responses meant "yes" or "no," appellant indicated he meant "yes." Appellant proceeded to talk with the officers and answer their questions.

After establishing that appellant was 16 years old, lived with his mother, and was on probation, Sergeant Torpey told appellant to "wake up" and asked if he was "coming down from something right now?" Appellant replied, "No." Appellant denied using heroin or pills. The officers asked appellant to keep his eyes open.

Appellant told the officers that prior to the burglary, he had been "smoking weed" and "listening to music" at a friend's house. Afterward, he ate food from Jack-in-the-Box and searched for an empty house. Appellant admitted that he entered McAtee's home through an unlocked back door. When the woman discovered his presence, she tried to "disarm [him]," so he "assaulted her." He admitted to stabbing McAtee with a knife but denied punching or kicking her. He kept stabbing her even though he did not want to and speculated that it was because he "already had a warrant" and was concerned McAtee might scream and attract attention.

5

Appellant knew that he could possibly kill McAtee by stabbing her, but he also "didn't realize [he] had stabbed her that many times."

Appellant remained in the house looking for guns and ammunition. He admitted he took McAtee's car keys because he was planning to take her car but ran away when he saw a police officer in the area. Appellant disconnected the land line because he did not want to hear it ringing. He swore he was going to call an ambulance for McAtee.

Appellant was emotional and cried during parts of the interview and at one point, he told the officers that he had just found out his girlfriend was pregnant.

The officers told appellant he was "being a man" by telling the truth and they would help him "work through it" even though it was difficult to take responsibility for his actions.

When asked, appellant indicated that he did not want to know McAtee's physical condition. Appellant stated, "Guess I'll find out when I see the charge. I know it's not going to be assault with a deadly weapon." The officers told appellant he stabbed McAtee 29 times, and asked why he stabbed her so many times. Appellant said, "Right now, that's why I answered all the, you know, possibly . . . she's dead." Near the end of the interview, the officers informed appellant that McAtee was still alive and asked appellant to pray for her.

The Juvenile Court's Ruling

The defense filed a motion to exclude appellant's statements made to police officers in violation of his Fifth and Fourteenth Amendment rights. After hearing from both parties, the juvenile court denied the motion. The juvenile court explained that although it had several concerns, it found

6

appellant's waiver of his right against self-incrimination was knowing, intelligent, and voluntary.

After a contested jurisdictional hearing, the juvenile court sustained the petition. As to count 1, the juvenile court found the allegation that appellant committed the offense willfully, deliberately, and with premeditation not true. The juvenile court found true the special allegations that appellant inflicted great bodily injury on a person 70 years of age and older (Pen. Code, § 12022.7, subd. (c)) and personally used a deadly and dangerous weapon (*id.*, § 12022, subd. (b)(1)).

The juvenile court ordered appellant to a Secured Youth Treatment Facility with a maximum confinement time of 21 years and 10 months but subject to a maximum age of confinement of 25 years. The juvenile court set the baseline term at five years.

*Discussion*

Appellant's sole contention is that his *Miranda* waiver was not knowing, intelligent, or voluntary. Specifically, he contends his waiver: (1) was not knowing or intelligent because he was sleep deprived, under the influence of narcotics, and his young age "greatly impacted" his ability to comprehend his *Miranda* rights, (2) was not voluntary because police used coercive tactics, and (3) was prejudicial. As we shall explain, none of appellant's contentions have merit.

"The Fifth Amendment to the United States Constitution provides that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . .' [Citation.] In *Miranda, supra*, 384 U.S. 436, the United States Supreme Court '"adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the 'inherently compelling pressures' of

custodial interrogation." [Citations.]' [Citation.] Under *Miranda* and its progeny, "'a suspect [may] not be subjected to custodial interrogation unless he or she knowingly and intelligently has waived the right to remain silent, to the presence of an attorney, and, if indigent, to appointed counsel.'" [Citation.] To be valid, a *Miranda* 'waiver must be voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" [citation], and knowing in the sense that it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." . . . '" (*People v. Jones* (2017) 7 Cal.App.5th 787, 809 (*Jones*).)

"Juveniles, like adults, may validly waive their *Miranda* rights." (*Jones, supra,* 7 Cal.App.5th at p. 809.) "To establish a valid waiver of *Miranda* rights, the prosecution must show by a preponderance of the evidence that the waiver was knowing, intelligent and voluntary. [Citation.] Determining the validity of a *Miranda* rights waiver requires an evaluation of the defendant's state of mind and an inquiry into the circumstances of the interrogation. [Citation.] When a juvenile's waiver is at issue, consideration must be given to factors such as "the juvenile's age, experience, education, background, and intelligence, and whether he or she has the capacity to understand the *Miranda* warnings, the nature of their Fifth Amendment rights, and the consequences of waiving those rights." (*In re M.S.* (2019) 32 Cal.App.5th 1177, 1189.) The "totality-of-the-circumstances" test applies in determining the validity of a minor's waiver. (*Fare v. Michael C.* (1979) 442 U.S. 707, 725; *People v. Nelson* (2012) 53 Cal.4th 367, 375 (*Nelson*).)

"In reviewing the validity of a *Miranda* waiver, "'we accept the trial court's determination of disputed facts if supported by

8

substantial evidence, but we independently decide whether the challenged statements were obtained in violation of *Miranda*." [Citation.]'" (*Jones, supra*, 7 Cal.App.5th at p. 809, quoting *People v. Hensley* (2014) 59 Cal.4th 788, 809; *M.S., supra*, 32 Cal.App.5th at p. 1189.)

Here, the juvenile court determined that appellant made a knowing, intelligent, and voluntary waiver of his *Miranda* rights. The record supports this determination.

Although appellant was somewhat "sleepy" at the outset of the interview, nothing in the record suggests that he did not understand his *Miranda* rights and the consequences of waiving those rights. When Sergeant Torpey read appellant his *Miranda* rights, appellant responded affirmatively that he understood those rights. At no time did appellant ask to speak with a parent or ask to stop the interview. When the officers expressed concern that appellant might be "coming down from something" like "heroin" or "pills," appellant replied, "No."

The juvenile court noted that other than the "mh-mms in the beginning," appellant did not have "slurred speech" and was not "unintelligible." Rather, his demeanor was "wholly consistent" with someone who was "sleepy" and had just woken up. After a few minutes, his voice was "stronger [and] more clear." He "expressed remorse" and "showed emotion." He had no difficulty relaying "specific details," including conversations he had with the victim, the layout of the house, street names, and why he disposed of the BB gun. As the juvenile court observed, "It's clear he understood what he was saying. It's clear he understood the magnitude."

Appellant next contends his "young age" precluded him from making a knowing, intelligent, and voluntary waiver. We

9

disagree.  Although appellant had just turned 16 years old five days before his custodial interrogation, he was familiar with law enforcement and the criminal justice system.  He had a significant criminal record and was "on the run" when he committed the instant offenses after failing to appear for a prior offense.  He also displayed some understanding of the law when he correctly predicted that he would not merely be charged with "assault with a deadly weapon" given the nature of the offenses in this case.

Moreover, appellant's contention overlooks that courts have found a valid waiver in cases involving juveniles even younger than appellant.  (See, e.g., *Nelson, supra*, 53 Cal.4th at pp. 374-375; *In re Anthony J.* (1980) 107 Cal.App.3d 962, 970-972; *People v. Lewis* (2001) 26 Cal.4th 334, 384; *In re Jessie L.* (1982) 131 Cal.App.3d 202, 215; *In re Abdul Y.* (1982) 130 Cal.App.3d 847, 867.)

Appellant asserts policy considerations, citing Welfare and Institutions Code section 625.6.  He contends that around the time of his interrogation, the law on a minor's right to counsel before a *Miranda* waiver "was completely overhauled in favor of minors."  (Welf. Inst. Code, § 625.6, subd. (a), as amended by Stats. 2020, ch. 335, § 2, eff. Jan. 1, 2021.)  But at the time of appellant's interrogation, the statutory requirement that a minor shall consult with counsel before any *Miranda* waiver only applied to minors up until the age of 16.  Thus, by its own terms, the statute did not apply here.  (See Welf. & Inst. Code, § 625.6, subd. (a), Stats. 2017, ch. 681, § 2, eff. Jan. 1, 2018.)

Appellant further contends his waiver was not voluntary because police used coercive tactics.  For example, he contends police (1) kept the interview room cold, (2) did not tell him the

victim was still alive, (3) used appellant's statement that his girlfriend was pregnant to get him to confess, (4) appealed to appellant's religious beliefs and asked him to pray for the victim.

Many of these "tactics" are alleged deviations from the Port Hueneme Police Department policies rather than federal constitutional standards. In any event, the juvenile court found that although the police did use "some tactics," there was no coercion or questioning that "resulted in the minor's will being overborne."

Our review of the record supports this determination. Here, the interview was not lengthy and lasted approximately one hour. The officers spoke to appellant in "level" tones. He was not restrained. The officers offered appellant something to drink, which he declined. At no time did he say he was hungry or complain that he was cold. Nor did he complain of any physical ailments other than that he was "tired." Finally, to the extent the officers' reference to religion was improper, the juvenile court noted it did not occur until the interview was "essentially" over.

Based on the totality of the circumstances, we conclude the prosecution met its burden of establishing that appellant's waiver was knowing, intelligent, and voluntary. Accordingly, the trial court did not err in admitting appellant's post-*Miranda* statements.

*Disposition*

The juvenile court's order is affirmed.

NOT TO BE PUBLISHED.


YEGAN, J.

We concur:


GILBERT, P. J.


BALTODANO, J.

F. Dino Inumerable, Judge
Superior Court County of Ventura
_____


Elana Goldstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and David A. Voet, Deputy Attorney General, for Plaintiff and Respondent.